## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ASH JANSSEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  17 cv 08625 |
| | ) | |
| MICHAEL RESCHKE and BOBB/AAR | ) | Judge Rebecca R. Pallmeyer |
| INVESTMENTS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM ORDER AND OPINION

In September 2014, Plaintiff Ash Janssen and a partner sold a portion of their business to BRI Holding, LLC, extending a $2.5 million loan to BRI for part of the purchase price.  BRI failed to make quarterly payments on the loan as required, and Janssen obtained a judgment against BRI Holding in an earlier lawsuit before Judge Blakey in this district (No. 16 C 10098).  In this lawsuit, Janssen seeks to collect the debt from BRI Holding's owners, Defendants Michael W. Reschke and Bobb/AAR Investments, LLC ("Bobb").  In addition to a veil-piercing argument, Janssen contends Reschke and Bobb received fraudulent transfers from BRI Holding.  (*See* Am. Compl. [13] ¶¶ 1–2.)  Defendants move for summary judgment on all counts [73].  For the reasons explained below, Defendants' motion for summary judgment is denied.

## BACKGROUND

### I.    Plaintiff's Sale of an Interest in AAR Parent, LLC to Defendants

This dispute originated in the sale of an ownership interest in All Around Roustabout, LLC ("AAR"), a limited liability company that provides storage and sanitation services in support of oil-drilling operations in Colorado.  (Defs.' Resp. to Pl.'s Local Rule 56.1 Statement of Additional Facts ("Defs.' SOF Resp.") [81] ¶ 5.)  Several limited liability companies were involved in the transaction, so the court includes an organization chart for convenience, below.  (*See* Figure 1, *infra*, Organization Chart, Ex. 1 to Janssen Dep. [75-1].)  On September 30, 2014, Plaintiff Ash

Janssen, AAR's then-CEO, and his business partner, Josh Wells, transferred their 100 percent membership interest in AAR to a holding company, AAR Parent, LLC, via another limited liability company in which AAR Parent had a 100 percent interest, AAR Intermediate Holding, LLC. (Pl.'s Resp. to Defs.' Local Rule 56.1 Statement of Facts ("Pl.'s SOF Resp.") [76] ¶¶ 6–7.) AAR Parent was managed by a board consisting of the parties on either side of the "v." in this case: Plaintiff Janssen, Defendant Reschke, and Robert J. Bobb, who owns and controls Defendant Bobb/AAR Investments, LLC.[1] (Id. ¶ 10.) As a result of this sale, Janssen and Wells together received $100 million in cash ($50 million each), and each received a 15 percent membership interest in AAR Parent. (Id. ¶ 7.) The cash distribution was funded with a $100 million loan to AAR Intermediate (guaranteed by AAR Parent) from Medley Capital Corporation, an unrelated bank. (Id. ¶¶ 7, 10; see also Manning Dep. [76-9] 21:3–6; Bobb Dep. [76-5] 25:14–22.) AAR Parent paid $20 million on the loan before defaulting in late 2015. (Pl.'s SOF Resp. ¶ 26.)

Also on September 30, 2014, BR Investment Partners, LLC ("BRIP"), an Illinois limited liability company, acquired as its sole asset a 70 percent membership interest in AAR Parent. (Id. ¶¶ 5, 8, 17.) BRIP is wholly-owned by BRI Holding, LLC, an Illinois limited liability company founded on September 18, 2014, which is controlled by the Defendants in this case: Defendant Michael W. Reschke owns a 49.9 percent interest and Defendant Bobb/AAR Investments, LLC owns a 50 percent interest. (Id. ¶¶ 1–2; Defs.' SOF Resp. ¶ 1.) Defendant Reschke's son, Michael W. Reschke, Jr., owns the remaining 0.1 percent interest in BRI Holding, LLC. (Pl.'s SOF Resp. ¶ 6.) BRI Holding's sole asset was its 100 percent ownership interest in BRIP; and distributions from BRIP, via the 70 percent interest in AAR Parent, was BRI Holding's only source of revenue. (Pl.'s SOF Resp. ¶¶ 17–18.) BRI Holding was initially capitalized with $1.498 million from Reschke, $1,500 from Michael Reschke, Jr., and $1.5 million from Bobb. (Defs.' SOF Resp.

---

[1] Bobb/AAR Investments, LLC is an Illinois limited liability company, and Robert J. Bobb is the sole member-manager. (Pl.'s SOF Resp. ¶ 10.) For ease of explanation, the court refers to Bobb/AAR Investments, LLC as "Bobb."

¶ 11; Ex. A to BRI Holding Operating Agreement, Ex. 6 to Defs.' SOF.) Reschke and Bobb contributed additional cash to fund BRIP's purchase of a 70 percent interest in AAR Parent, bringing their total cash contributions to $2.25 million each, and Janssen contributed $2.5 million to BRIP via BRI Holding in the form of an unsecured loan. (Defs.' SOF Resp. ¶ 11.) BRI Holding's funds were contributed to BRIP along with $8 million from outside investors (unidentified third parties who are not involved in this litigation), for a total of $15 million. (*Id.*) This $15 million was then used to acquire BRIP's 70 percent interest in AAR Parent, LLC, and indirectly, a 70 percent interest in AAR. (*Id.* ¶ 6.) BRIP was required to pledge its 70 percent interest in AAR Parent as collateral to secure the $100 million loan from Medley Capital.[2] (*Id.* ¶ 7.)



---

[2] After AAR Parent violated certain covenants in the loan agreement in the fourth quarter of 2015, Medley Capital declared a default on the loan. (Pl.'s SOF Resp. ¶ 26.) In April 2016, BRIP transferred its 70 percent interest in AAR Parent to Medley Capital. (*Id.* ¶ 27.)

3

## II.  Tax Policies

The entities involved in this dispute are limited liability companies that are taxed as partnerships, meaning that business income is not taxed at the entity level, but instead all tax liability is passed through to the individual members. (Defs.' SOF Resp. ¶ 11.)  Accordingly, each member pays income tax attributable to AAR's income on his individual tax return. (*Id.*)  To offset their members' tax burdens, AAR Parent, BRIP, and BRI Holding each have tax distribution policies that permit the LLC to distribute to its members an amount of money equal to the estimated taxes each member will have to pay. (*Id.* ¶ 12.)  AAR Parent's tax distribution policy simply authorizes quarterly tax distributions to its members. (*See* Ex. C to Answer to Am. Compl. [14].)  BRIP's policy permits quarterly tax distributions "to each Member in proportion to their Percentage Interests, in an aggregate amount equal to the tax distribution received from the Company's membership interest in AAR Parent, LLC." (BRIP Operating Agreement § 5.4, Ex. 5 to Reschke Decl., Ex. A to Defs.' Local Rule 56.1 Statement of Facts ("Defs.' SOF") [75].)  These distributions are permitted "to the extent cash is available after the payment or reserve for principal and interest on the Senior Notes and any other obligations of the Company." (*Id.*)  BRI Holding has a similar tax distribution policy:  "To the extent cash is available after the payment or reserve for obligations of the Company, the Managing Members shall cause the Company to make quarterly tax distributions to each Member in proportion to their Percentage Interests, in an aggregate amount determined by the Managing Members." (BRI Holding Operating Agreement § 5.4, Ex. 6 to Reschke Decl.)

In January 2015, AAR Parent made a tax distribution to its members based on AAR's estimated fourth-quarter 2014 taxable income of $12,059,548. (Pl.'s SOF Resp. ¶ 13.)  The tax distribution was $2,718,159 and Janssen and Wells each received 15 percent while BRIP received 70 percent. (*Id.*)  In January 2015, BRIP distributed $1,089,034 of this tax distribution

to BRI Holding, which in turn transferred the tax distribution to its members on January 12, 2015—$480,554 to Reschke and $481,517 to Bobb. (*Id.* ¶ 15.) It is these transfers that Janssen contests in this lawsuit.

After January 12, 2015, AAR made no further distributions to its members. (Defs.' SOF Resp. ¶ 22.) Reschke testified that AAR's board of directors, then Reschke, Robert Bobb, and Janssen, agreed in April 2015 that it would not be prudent to make distributions to investors due to the drop in AAR's business related to a decline in the oil drilling activity of AAR's customers. (*Id.* ¶ 25; Reschke Dep. 60:16–23; Bobb Dep. 25:1–3.) Richard W. Manning, AAR's Chief Financial Officer from September 2014 until April 2016, testified that AAR's decision whether to make distributions to its members depended on AAR's revenue and profitability. (Defs.' SOF Resp. ¶ 25.) He noted that if AAR failed to comply with certain covenants in its loan from Medley Capital, Medley Capital could prevent AAR from making any distributions to investors. (*Id.*) AAR's revenue and profitability were correlated with its customers' oil drilling activity, and as a general matter, that activity increases as oil prices rise and decreases as the price of oil drops. (*Id.* ¶ 23.) The parties disagree about how, precisely, to characterize the trend in oil prices between 2014 and 2015, but both rely on data from the U.S. Energy Information Administration showing that the spot price of oil declined starting in the summer of 2014, rebounded slightly between January and June 2015, and then bottomed out in January 2016. (*Id.* (citing U.S. Energy Info. Admin., *Cushing, OK WTI Spot Price FOB*, http://www.eia.gov/dnav/pet/hist/RWTCD.htm (last visited Feb. 11, 2020)).) In 2014, Manning told Reschke and Bobb that in his (Manning's) opinion, a decline in oil prices would pose a risk to the value of an investment in AAR. (Defs.' SOF Resp. ¶ 24.)

### III. Plaintiff's Promissory Note and Related Litigation

The $2.5 million loan from Janssen to BRI Holding is at the heart of this dispute. Janssen agreed to loan $2.5 million to BRI Holding as part of BRIP's larger acquisition of a 70 percent interest in AAR Parent from Janssen and Wells. Janssen's loan was evidenced by a five-year promissory note, maturing on September 30, 2019 and requiring quarterly interest payments at a

rate of 20 percent per annum. (*Id.* ¶ 13; Pl.'s SOF Resp. ¶ 9.) This promissory note was unsecured, and neither Reschke nor Bobb personally guaranteed the debt. (Pl.'s SOF Resp. ¶ 9.) The first interest payment, for interest accrued during the fourth quarter of 2014, was due on January 15, 2015. (*Id.*) On January 12, 2015, BRI Holding paid Janssen $125,000. (*Id.* ¶ 16; Defs.' SOF Resp. ¶ 18.) Plaintiff disputes that $125,000 was the full amount that he was due in interest, but does not dispute receiving the check. (Pl.'s SOF Resp. ¶ 16.)

As of July 2016, BRI Holding had made no further payments on Plaintiff's promissory note aside from the disputed January 2015 payment, and Plaintiff, through his attorney, sent a demand letter to BRI Holding claiming that BRI Holding had defaulted on its interest obligation. (*Id.* ¶ 28.) Then in October 2016, Plaintiff sued BRI Holding for default on the note in the Northern District of Illinois. (*Id.* ¶ 29.) In May 2017, Plaintiff won his motion for judgment on the pleadings, *see Janssen v. BRI Holding, LLC*, No. 16 CV 10098, 2017 WL 2080424 (N.D. Ill. May 15, 2017), and the court entered judgment in his favor on June 2017 in the amount of $4,074,390.48. BRI Holding has not paid any portion of the judgment, and currently has no assets. (Defs.' SOF Resp. ¶ 20.) Reschke testified in his deposition that BRI Holding has no plan to acquire assets in the future. (*Id.* ¶ 21.)

In this court, Plaintiff seeks damages from Defendants Reschke and Bobb, alleging in Counts I through III that the tax distributions Defendants received from BRI Holding were fraudulent transfers. In Count IV, Plaintiff seeks to pierce BRI Holding's corporate veil to hold Reschke and Bobb jointly and severally liable for the outstanding judgment in favor of Plaintiff on the unpaid promissory note. Defendants urge that they are entitled to summary judgment on Counts I through III of Plaintiff's Amended Complaint because the tax distribution to BRI Holding from BRIP, and subsequently to BRI Holding's members, was mandatory under their tax distribution policies. Additionally, Defendants argue that they are entitled to summary judgment on Count IV because there is no fraud or injustice that warrants piercing BRI Holding's corporate

veil; Defendants note that Janssen knew he was loaning $2.5 million to a newly-formed holding company but obtained no personal guaranty on the note from its members.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The court "view[s] the record in the light most favorable to [the nonmoving party], and draw[s] all inferences in his favor." *Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; FED. R. CIV. P. 56(c). In such situations, there is no issue for trial because a "dispute about a material fact is 'genuine'" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## DISCUSSION

Plaintiff Janssen's fraudulent transfer allegations stem from the tax distribution from AAR Parent to its members in January 2015. When AAR Parent distributed funds to cover the tax liabilities of its members, including Janssen himself and BRIP, BRIP transferred the funds to its member, BRI Holding, which in turn transferred the money to Reschke and Bobb. Plaintiff alleges that these final transfers, between BRI Holding and Defendants, were fraudulent transfers under Illinois law. The Illinois Uniform Fraudulent Transfer Act ("UFTA") identifies two kinds of fraudulent transfers: "fraud in law" and "fraud in fact." *Bank of Am. v. WS Mgmt., Inc.*, 2015 IL App (1st) 132551, ¶ 87, 33 N.E.3d 696, 723 (1st Dist. 2015) (citing *Apollo Real Estate Inv. Fund, IV, L.P. v. Gelber*, 403 Ill. App. 3d 179, 193, 935 N.E.2d 963, 976 (1st Dist. 2010)). A "fraud in law" transfer is described in Sections 5(a)(2) and 6(a) of the UFTA, and occurs when the "transfer is made for no or inadequate consideration, and the fraud is presumed." *People ex rel. Dep't of Human Rights*

*v. Oakridge Nursing & Rehab Ctr.*, 2019 IL App (1st) 170806, ¶ 41, 128 N.E.3d 397, 406 (1st Dist. 2019). A "fraud in fact" transfer is set forth in Section 5(a)(1) of the UFTA, and requires a party to prove that the "transfer was made with actual intent to hinder, delay, or defraud the creditors." *Bank of Am.*, 2015 IL App (1st) 132551, ¶ 87, 33 N.E.3d at 723.

## I.     Fraudulent Transfer Pursuant to 740 ILCS 160/6(a)

The first type of fraud-in-law transfer is described in Section 6(a) of Illinois UFTA, and states that "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred" if two conditions are met. 740 ILCS 160/6(a). The creditor must show, first, that the debtor "made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation," and second, that "the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." *Id.*

### A.     Reasonably Equivalent Value

The UFTA draws the phrase "reasonably equivalent value" from the bankruptcy code, so a court considering whether a debtor received reasonably equivalent value in exchange for a transfer should consider how the phrase has been interpreted in bankruptcy cases. *Leibowitz v. Parkway Bank & Tr. Co. (In re Image Worldwide, Ltd.)*, 139 F.3d 574, 577 (7th Cir. 1998). Whether a debtor received reasonably equivalent value is a question of fact that is not decided by a "fixed mathematical formula." *Barber v. Golden Seed Co.,* 129 F.3d 382, 387 (7th Cir. 1997). Instead, courts consider several factors including "(1) whether the value of what was transferred is equal to the value of what was received; (2) the fair market value of what was transferred and received; (3) whether the transaction took place at arm's length; and (4) the good faith of the transferee." *Grochocinski v. Schlossberg (In re Eckert)*, 388 B.R. 813, 835 (Bankr. N.D. Ill. 2008), *aff'd*, 402 B.R. 825 (N.D. Ill. 2009) (citing *Barber*, 129 F.3d at 387). Fair market value is "the price that a seller is willing to accept and a buyer is willing to pay on the open market in an arm's-length

transaction." *Grochocinski*, 388 B.R. at 835 (quoting *Doctors Hosp. of Hyde Park, Inc. v. Desnick (In re Doctors Hosp. of Hyde Park, Inc.)*, 360 B.R. 787, 840 (Bankr. N.D. Ill. 2007)).

The distinction between the tax status of a limited liability company ("LLC") and that of a corporation is relevant to whether BRI Holding received reasonably equivalent value for the tax distribution from BRI Holding (through BRIP) to Reschke and Bobb to reimburse them for paying taxes on income attributable to AAR's activities. Relying on *Crumpton v. Stephens* and *Gold v. United States*, Defendants argue that BRI Holding received reasonably equivalent value for the tax distribution because, had Defendants not agreed to personally pay BRI Holding's taxes, the entity would have had to pay the taxes instead. Plaintiff, in contrast, contends that BRI Holding did not receive reasonably equivalent value for the tax distribution because this case, unlike those cited by Defendants, involves LLCs, not a corporation that elected to be taxed as an S corporation. Ordinarily, the taxable income of a corporation is taxed once at the entity level and again at the individual shareholder level when profits are distributed. Corporate entities that maintain this tax status are referred to as C corporations. *See Vainisi v. Comm'r*, 599 F.3d 567, 568 (7th Cir. 2010). Alternatively, an eligible corporation may elect to be taxed under subchapter S of the Internal Revenue Code which creates a "pass-through system" that eliminates the corporate-level tax on profits. *Bufferd v. Comm'r*, 506 U.S. 523, 525 (1993). Instead, like a partnership, the S "corporation's profits pass through directly to its shareholders on a pro rata basis and are reported on the shareholders' individual tax returns." *Gitlitz v. Comm'r*, 531 U.S. 206, 209 (2001). In contrast, LLCs with at least two members are classified, by default, as a partnership for federal income tax purposes. *See* IRS, PUBL'N 3402, TAXATION OF LIMITED LIABILITY COMPANIES 2 (2016). This means that there is no entity-level tax and each member is taxed on his share of the income from the LLC, unless the members opt to be taxed as a C corporation. *See id.* at 3.

The courts in both *Crumpton* and *Gold* held that corporations that elected to be taxed as S corporations received reasonably equivalent value in exchange for tax distributions made to reimburse shareholders for reporting the corporations' profits on their individual tax returns. *See*

9

*Crumpton v. Stephens (In re Northlake Foods, Inc.)*, 715 F.3d 1251, 1253, 1256 (11th Cir. 2013); *Gold v. United States (In re Kenrob Info. Tech. Servs., Inc.)*, 474 B.R. 799, 801 (Bankr. E.D. Va. 2012); *but see Pryor v. Tiffen (In re TC Liquidations LLC)*, 463 B.R. 257, 271 (Bankr. E.D.N.Y. 2011) ("Defendants chose to maintain the 'S' Corporation status, . . . which meant that Defendants, as the shareholders, were personally liable for the taxes. It was improper for the Debtors to issue the Tax Dividends and essentially pay Defendants' personal tax obligations. There is no shown consideration provided to the Debtors for these payments."). The courts cited several benefits that the corporations received in exchange for an agreement to pay a dividend to each shareholder sufficient to cover his tax liability attributable to the corporation's income. The primary benefit is that, at least in some circumstances, taxation as an S corporation can reduce overall tax payments on the business' income by eliminating the entity-level tax. *Gold*, 474 B.R. at 802; *see also Crumpton*, 715 F.3d at 1256 (agreeing to reimburse shareholders for paying the corporation's taxes "secured shareholder consent . . . to shift to S-corporation status whenever it determined it was advantageous to do so"). Additionally, though a corporation with a contractual obligation to make tax distributions must eventually repay its shareholders, the S-corporation would "not need to satisfy that obligation until [ ] after the shareholders had incurred [the corporation's] tax liability"—meaning that a shareholder that took on the tax obligation provides the corporation with the benefit of holding its income over time. *Crumpton*, 715 F.3d at 1256; *see also Gold*, 474 B.R. at 802 (explaining that the corporation "received the benefit of not distributing its income to the shareholders even though that income was passed through for tax purposes," which enabled the corporation to use the money as operating capital).

Limited liability companies, on the other hand, need not make an election to avoid the entity-level tax paid by C corporations. By default, an LLC has no income tax liability of its own; "its members [are] required to treat their share of [the LLC's] income as a personal tax liability." *Official Comm. of Unsecured Creditors of SGK Ventures, LLC v. NewKey Grp., LLC (In re SGK Ventures, LLC)*, 521 B.R. 842, 859 (Bankr. N.D. Ill. 2014). Accordingly, an LLC's commitment to

reimburse its members for tax payments attributable to the business' income does not produce the same benefit as it would for a corporation. *Id.* On this reasoning, the courts in *SGK Ventures* and *Zazalli* found that LLCs received no reasonably equivalent value in exchange for distributing to their members "sufficient funds to allow them to pay the tax liability resulting from [the LLC's] income." *Id.*; *see also Zazalli v. Swenson (In re DBSI, Inc.)*, 561 B.R. 97, 99 (Bankr. D. Idaho 2016), *rev'd in part on other grounds*, 697 F. App'x 493 (9th Cir. 2017). Instead, a commitment to pay an LLC member's tax liability is "equivalent to a corporate dividend" for which the LLC receives no consideration. *SGK Ventures*, 521 B.R. at 859. Both courts distinguished *Crumpton* and *Gold* because those businesses "were already corporations subject to taxes and thus accrued a concrete benefit by electing a different taxable status." *Zazalli*, 561 B.R. at 101. In *Zazalli*, the IRS (defending transfers against a fraudulent transfer charge) argued that the LLC received reasonably equivalent value for the tax distributions because it could have elected to be taxed like a C corporation, with an entity-level income tax, but instead chose a tax status that made its members personally liable. *Id.* at 100. The court was not persuaded. It noted that the LLC had never actually opted for corporation tax status. Accordingly, it had never been "subject to federal income tax at the entity level," and "realized no 'savings' because it owed no taxes." *Id.* The "argument that the entity *could have* chosen a legal status which would have subjected it to direct tax liability" was, in the court's view, "speculative and meaningless." *Id.*

The *SGK Ventures* and *Zazalli* courts also recognized that satisfying a contractual obligation or an antecedent debt can provide equivalent value, but distinguished an LLC's promise to pay its members' tax liabilities from such an obligation. *See* 11 U.S.C. § 548(d)(2)(A); *Freeland v. Enodis Corp.*, 540 F.3d 721, 735 (7th Cir. 2008) (quoting *In re Carrozzella & Richardson*, 286 B.R. 480, 491 (Bankr. D. Conn. 2002) ("[D]ollar-for dollar forgiveness of a contractual debt" is "reasonably equivalent value.")). The *SGK Ventures* court noted that any commitment the LLC made to pay its members' personal tax liability was completely discretionary with the LLC's managers. *Id.* Similarly, in *Zazalli*, the LLC's operating agreement authorized it to make

distributions of estimated taxes to the members and their assignees, but the court found that the satisfaction of any obligation to pay the tax liabilities of the LLC's members was not "value" because the distributions were not mandatory: distributions were authorized only if the "cash position of the Company [was] sufficient to allow a distribution."[3] *Zazalli*, 561 B.R. at 101.

In this case, each of the involved entities is an LLC that has always been taxed as a partnership. As in *SGK Ventures* and *Zazalli,* BRI Holding received no reasonably equivalent value for tax distributions to Reschke and Bobb. Specifically, BRI Holding received no benefit from its pass-through tax status because it never had any entity-level tax obligations (nor did AAR Parent, the LLC that made the initial tax distribution). Defendants urge that because BRI Holding's operating agreement required BRI Holding to pay a tax distribution, that distribution must be understood to have reasonable value as forgiveness of a contractual debt. *See Freeland*, 540 F.3d at 735. As Defendants see things, because BRI Holding paid Janssen the interest payment he was due in January 2015, BRI Holding had no further outstanding debts, meaning that the tax distribution was mandatory.[4] (Defs.' Mem. in Supp. of Mot. for Summ. J. ("Defs.' MSJ") [74] at 6.)

---

[3]     Specifically, the agreement stated: "If the cash position of the Company is sufficient to allow a distribution of the amount of such estimated taxes, then the Company shall distribute, no later than April 15th, to the Members and Assignees such amount in proportion to their Units." *Zazalli*, 561 B.R. at 101.

[4]     Plaintiff also briefly argues that the tax distribution BRI Holding made in January 2015 was improper because BRI Holding had not yet paid all the interest owed to Plaintiff. The court need not reach this argument but notes it rests on hearsay; Plaintiff testified although he received an interest payment of $125,000 in January 2015, "somebody told [him] that" the check was over $1,000 short. (Janssen Dep. 62:16–18; 64:1–3.) Nor is the court persuaded by Plaintiff's assertion that Judge Blakey made a finding about the January 2015 interest payment that is binding on Defendants under the doctrine of collateral estoppel. (Pl.'s Mem. in Opp'n [80] at 8.) The opinion in that case cited Plaintiff's complaint for the finding that "Defendant failed to make the required interest payments on January 15, 2015; April 15, 2015; June 15, 2015; October 15, 2015; January 15, 2016; April 15, 2016; and July 15, 2016." *Janssen*, 2017 WL 2080424, at *1. This does not appear to be a finding on an issue that was "actually litigated" as required for collateral estoppel, or issue preclusion. *See* RESTATEMENT (SECOND) OF JUDGMENTS § 27(e) (1982) ("An issue is not actually litigated if . . . it is raised by a material allegation of a party's pleading but is admitted (explicitly or by virtue of a failure to deny) in a responsive pleading; nor is it actually litigated if it is raised in an allegation by one party and is admitted by the other before evidence on the issue is adduced at trial.").

The court disagrees. BRI Holding's operating agreement provides that *"[t]o the extent cash is available* after the payment *or reserve* for obligations of the Company, the Managing Members shall cause the Company to make quarterly tax distributions to each Member in proportion to their Percentage Interests . . . ." (*Id.* at 5 (emphasis supplied).) Given this conditional language, tax distributions were not truly mandatory. *See Zazalli*, 561 B.R. at 101; *cf. Crumpton*, 715 F.3d at 1253 ("If the Corporation's income ever becomes taxable to the Shareholders, rather than to the Corporation, the Corporation shall pay a dividend at least annually . . . ."). As BRI Holding, and every entity up the chain, was taxed by default as a partnership, BRI Holding's commitment to reimburse its members for their tax liability is "equivalent to a corporate dividend" for which BRI Holding received no consideration. *SGK Ventures*, 521 B.R. at 859.

## B.     BRI Holding's Solvency

For BRI Holding to be liable for making a fraudulent transfer, Plaintiff also bears the burden of showing by a preponderance of the evidence that BRI Holding was insolvent at the time the transfer was made or "became insolvent as a result of the transfer." 740 ILCS 160/6(a); *see also Bachrach Clothing, Inc. v. Bachrach (In re Bachrach Clothing, Inc.)*, 480 B.R. 820, 859 (Bankr. N.D. Ill. 2012). Insolvency is a question of fact, *id.*, and is defined by both the Bankruptcy Code and the Illinois UFTA "as having a balance sheet on which liabilities exceed [the fair market price of] assets." *Baldi v. Samuel Son & Co., Ltd.*, 548 F.3d 579, 581 (7th Cir. 2008); *Newman v. Assoc. Bank, Nat'l Ass'n (In re World Mktg. Chicago, LLC)*, 574 B.R. 670, 679 (Bankr. N.D. Ill. 2017). "Whether a debtor is insolvent under the balance sheet test is determined by analyzing what a willing buyer would have given for the debtor's entire package of assets and liabilities at the relevant time." *Paloian v. LaSalle Bank Nat'l Ass'n (In re Doctors Hosp. of Hyde Park, Inc.)*, 507 B.R. 558, 632 (Bankr. N.D. Ill. 2013). "The valuation of assets and liabilities for the purpose of performing this analysis should be determined by expert testimony or recent appraisals." *Newman*, 574 B.R. at 679. To be clear, BRI Holding's solvency depends on the value of its sole asset, AAR Parent, offset by its liability on Plaintiff's note. If AAR Parent was not solvent, then

BRI Holding had no assets aside from the tax distribution, but owed $5 million total on the note over five years (repayment of $2.5 million principal plus 20 percent interest for five years).[5]

For purposes of the balance sheet test, assets are generally valued at their "going concern or fair market price unless a business is on its deathbed." *Id.* at 680 (quoting *Schwinn Plan Comm. v. AFS Cycle & Co.* (*In re Schwinn Bicycle*), 192 B.R. 477, 486 (Bankr. N.D. Ill. 1996)). A business is on its deathbed if it "is in a precarious financial condition," *id.*, that is, when "the assets on which a company can recover in the ordinary course of its business" are less than "the total of the cost of realizing them and other liabilities." *Baldi v. Samuel Son & Co.* (*In re McCook Metals, L.L.C.),* No. 05 C 2990, 2007 WL 4287507, at *6 (N.D. Ill. Dec. 4, 2007), *aff'd*, 548 F.3d 579 (7th Cir. 2008). If a business is on its deathbed, its assets should be valued on a liquidation basis rather than using the going concern value. *Newman*, 574 B.R. at 680. Determining when a business is on its deathbed is best done by an expert. *Id.*

Importantly here, going-concern valuation "evaluates an entity as an active unit, 'taking into account the additional value element which flows from the combination of the various assets to an economic unit.'" *Baldi*, 2007 WL 4287507, at *6 (quoting 2 COLLIER ON BANKRUPTCY § 101.32). Courts have recognized that goodwill may be included in a going concern valuation. *See, e.g., EBC I, Inc. v. Am. Online, Inc. (In re EBC I, Inc.)*, 380 B.R. 348, 357 (Bankr. D. Del. 2008), *aff'd*, 382 F. App'x 135 (3d Cir. 2010) ("[I]n determining insolvency under § 548(a)(2)(B)(i), it is appropriate to take into account intangible assets not carried on the debtor's balance sheet, including, *inter alia*, good will."); *Bergquist v. Anderson-Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.)*, 56 B.R. 339, 386 (Bankr. D. Minn. 1985) ("I am further satisfied that goodwill is

_____

[5] Presumably, to determine an accurate valuation of the note as of January 2015 for purposes of the balance-sheet test, the face value should be discounted to account for, among other factors, the risk of nonpayment. But neither party has provided the court with such a valuation, so for purposes of this opinion the court will refer to the note's face value. The court notes, further, that Medley Capital had the ability to prevent AAR Parent from making distributions in the event that AAR Parent failed to comply with loan covenants. Medley Capital did not in fact intervene to prevent the January 2015 distributions. Defendants have not argued that the failure to intervene requires the court to conclude that AAR Parent was solvent at that time.

included as an element of going concern value."); *but see Collins v. Kohlberg & Co. (In re Sw. Supermkts., LLC)*, 325 B.R. 417, 423 n.12 (Bankr. D. Ariz. 2005) ("[G]oodwill that is not realizable by creditors is disregarded."). Because goodwill cannot be independently sold, however, it is excluded from a liquidation valuation. *See Kendall v. Sorani (In re Richmond Produce Co.)*, 151 B.R. 1012, 1019 (Bankr. N.D. Cal. 1993) ("Good will and organization expense could not be sold to satisfy a creditor's claim."); *see also Coated Sales, Inc. v. First E. Bank, N.A. (In re Coated Sales, Inc.)*, 144 B.R. 663, 672 (Bankr. S.D.N.Y. 1992) (excluding the goodwill of a company's subsidiaries from its valuation because the subsidiaries "were in financial despair" at the time of the transfer).

Neither party offers an expert assessment of whether BRI Holding was "on its deathbed" in January 2015. Defendants assert that it is most unlikely that BRI Holding became insolvent so soon after it was established, and so soon after it paid $100 million for its 70 percent interest in AAR Parent. On the other hand, BRI Holding had no assets other than that interest and, as Plaintiff points out, BRI Holding's ability to recover on that interest was uncertain, given that it was already encumbered by the $100 million loan to Medley Capital. (Pl.'s Mem. in Opp'n [80] at 12.) BRI Holding also had no guaranteed income—quarterly distributions from AAR Parent to BRI Holding were not mandatory—but had fixed liabilities on the promissory note due as soon as April 2015. The court finds that Plaintiff has raised a genuine issue of material fact regarding whether BRI Holding was "on its deathbed" as of January 2015 when it transferred the tax distribution to Defendants.

Whether BRI Holding was on its deathbed determines the appropriate method of valuation, and crucially whether goodwill should be excluded from the calculation, which appears dispositive of BRI Holding's solvency at the time of the transfer. Neither party offered expert testimony regarding the valuation of AAR Parent, BRI Holding's only asset. Defendants argue that BRI Holding was solvent in January 2015 for two reasons, but both are disputed. First, Defendants emphasize that BRI Holding purchased a 70 percent interest in AAR Parent in an arm's-length

transaction for nearly $100 million just a few months prior. If AAR Parent is properly valued as a going concern, that September 2014 purchase price is evidence of its fair value, but not dispositive given the change in the oil market during the intervening period. Second, Defendants cite AAR Parent's balance sheet for 2014, showing assets that exceeded its liabilities. (Defs.' MSJ at 8.) Plaintiff concedes that AAR Parent was solvent if the value of goodwill is included: AAR Parent's current assets as of December 31, 2014 totaled $40,411,771 compared to current liabilities of $47,108,103, while total assets were $143,336,344 and total liabilities were $124,026,956. (Pl.'s Mem. in Opp'n at 11.) Of those total assets, however, $81,554,875 was attributable to goodwill.[6] (Id.) If goodwill is excluded, AAR Parent, and by extension BRI Holding, was insolvent.[7] (Id.) Because there is a genuine dispute of material fact regarding whether BRI Holding was solvent, the court declines to grant summary judgment in favor of Defendants on Count I.

## II.    Fraudulent Transfer Pursuant to 740 ILCS 160/5(a)(2)

The second type of fraud-in-law transfer is described in Section 5(a)(2) of the Illinois UFTA and reflects the presumption that a debtor "who is generally not paying his debts as they become due is . . . insolvent." 740 ILCS 160/3(b). Like Section 6(a) of the UFTA, a plaintiff alleging fraud-in-law under Section 5(a)(2) of the Illinois UFTA must show that the debtor made the transfer "without receiving a reasonably equivalent value in exchange for the transfer," but unlike

---

[6]    Defendant cites to AAR's January 31, 2015 balance sheet showing cash on hand of $4,785,607 and shareholder equity of $19,201,303. (Ex. 4 to Manning Decl. [75-1].) Both total assets and total liabilities (including shareholder equity) were $139,240,757. (Id.) Goodwill accounts for $80,857,892 of total assets, meaning that excluding goodwill would make AAR balance-sheet insolvent.

[7]    In support of its argument that BRI Holding was insolvent at the time of the January 2015 transfers, Plaintiff notes that BRI Holding received no distributions from AAR Parent after January 2015, and BRI Holding's interest in AAR Parent was worthless by December 21, 2016. (Pl.'s Mem. in Opp'n at 10.) The court will not consider this information because "subsequent events are not considered in fixing fair market value except to the extent that they were reasonably foreseeable at the date of valuation." Paloian, 507 B.R. at 646 (quotations omitted). While the price of oil was falling at the end of 2014 and into early 2015, suggesting that future distributions were perhaps unlikely (Pl.'s Mem. in Opp'n at 10), Defendants note that AAR Parent was profitable at the end of 2014 despite the downturn in oil prices, so it could have been reasonable to expect AAR Parent to remain profitable. (Defs.' MSJ at 8.)

Section 6(a), the creditor's claim need not have arisen prior to when the transfer was made. 740 ILCS 160/5(a)(2). Rather, under Section 5(a)(2), a creditor may have a claim for a fraudulent transfer regardless of whether its "claim arose before or after the transfer was made," so long as one of two conditions is met. *Id.* The debtor must have either "engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction," or the debtor must have "intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due." 740 ILCS 160/5(a)(2). As explained above, BRI Holding did not receive reasonably equivalent value in exchange for the transfer of the tax distribution to Defendants.

Plaintiff bears the burden of showing that "at the time of the transfer, the debtor had incurred obligations elsewhere," and that "after the transfer, the debtor failed to retain sufficient property to pay his indebtedness." *Grochocinski*, 388 B.R. at 841. A debtor's assets are unreasonably small if the debtor "is left barely solvent and in a condition where bankruptcy or liquidation is substantially likely" because of "an inability to generate sufficient profits to sustain operations," in light of the debtor's contemplated liabilities or transactions. *Paloian*, 507 B.R. at 635. What a debtor believed, or reasonably should have believed, about its ability to pay debts "can be inferred where the facts and circumstances surrounding the transaction show that the debtor could not have reasonably believed that it would be able to pay its debts as they matured." *Id.* at 635–36. It is undisputed that, at the time BRI Holding transferred the tax distribution to Defendants, it had an obligation to pay interest, and eventually to repay the principal, on Plaintiff's promissory note. While Defendants suggest that BRI Holding was current on its debt to Plaintiff as of the time of the transfer, BRI Holding's pending interest payments to Plaintiff were fixed obligations without funds designated to satisfy them.

Defendants insist that BRI Holding reasonably believed that it would be able to repay Plaintiff's promissory note at the time it made the transfer. (Defs.' MSJ at 10.) Why, they ask, would BRI Holding have paid nearly $100 million for a 70 percent stake in AAR Parent if it believed

that investment would be worthless?  (*Id.*)  And despite Plaintiff's argument that the price of oil had been declining in late 2014, compromising the profitability of AAR Parent, Defendants note that AAR was profitable in the fourth quarter of 2014 and projected to be profitable in 2015.[8]  That AAR Parent anticipated being profitable does not, however, clearly demonstrate that BRI Holding reasonably believed it would be able to meet its upcoming debt obligations.  After all, BRI Holding was dependent on distributions from AAR Parent for income, and nothing in the record indicates that AAR Parent's profitability necessarily meant that BRI Holding would receive quarterly distributions.  Nor have Defendants responded to Plaintiff's argument that BRI Holding could not otherwise monetize its interest in AAR Parent given the Medley Capital loan.  BRI Holding had a known debt to Plaintiff, yet did not retain any cash to ensure that it could satisfy the upcoming interest payments should distributions from AAR Parent not be forthcoming.  Additionally, if AAR Parent was not solvent at the time of the transfer, BRI Holding's 70 percent interest in AAR Parent would essentially have been worthless and the tax distribution would represent a depletion of substantially all of BRI Holding's assets.  *See Grochocinski v. Zeigler (In re Zeigler)*, 320 B.R. 362, 379 (Bankr. N.D. Ill. 2005); *Bank of Am.*, 2015 IL App (1st) 132551, ¶ 93, 33 N.E.2d at 725.

A reasonable jury could draw opposing inferences from the record.  On the one hand, as Defendants argue, the tax distribution could have been made in accordance with BRI Holding's Operating Agreement, and could therefore represent normal business conduct.  On the other hand, the factual dispute regarding AAR Parent's solvency raises the question of whether it was

---

[8]    Plaintiff challenges the admissibility of the AAR Annual Business Plan for 2015, which supports AAR's projected profitability in 2015, because it apparently was not produced in discovery and because the Reschke Declaration does not lay a foundation for the document's authenticity and admissibility. (*See* Pl.'s SOF Resp. ¶ 22, 35.)  In his Declaration, Reschke stated that Exhibit 9, the business plan, was approved and issued by the board of AAR Parent on February 6, 2015, and that the board provided input on the business plan as it was prepared by Richard Manning.  (Reschke Decl. ¶ 19.)  Reschke was a member of the board at the time this document was prepared and, accordingly, has personal knowledge of whether the document attached as the AAR Annual Business Plan for 2015 (Ex. 9 to Reschke Decl.), is an accurate copy of the business plan that he received while on the AAR Parent board.  Reschke can also testify to his own level of involvement, as a board member, in the creation of this document.  Plaintiff's objection is overruled.

reasonable for BRI Holding to expect future distributions from AAR Parent, and accordingly, whether BRI Holding would have any future income or valuable assets. On summary judgment, the court must draw inferences in favor of the non-moving party. Under this standard, there are genuine disputes of material fact regarding whether BRI Holding's assets were unreasonably small in relation to its debt, and whether BRI Holding should reasonably have believed that it would be unable to pay its debts as they became due. *See* 740 ILCS 160/5(a)(2).

### III.   Fraudulent Transfer Pursuant to 740 ILCS 160/5(a)(1)

To succeed on a claim of actual fraud, or fraud in fact, against Defendants, Plaintiff must show that BRI Holding made the tax distribution to Defendants "with actual intent to hinder, delay, or defraud" its creditors. 740 ILCS 160/5(a)(1). Like a claim under Section 5(a)(2) of the Illinois UFTA, a creditor may bring a claim alleging a fraud-in-fact transfer regardless of "whether the creditor's claim arose before or after the transfer was made or the obligation was incurred." 740 ILCS 160/5(a)(1). But unlike fraud-in-law claims under Sections 5(a)(2) or 6(a), fraud is not presumed; rather the plaintiff must show the debtor's actual intent by clear and convincing evidence. *Wachovia Secs., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 757 (7th Cir. 2012). A plaintiff creditor need show only one type of fraud, either fraud in fact or fraud in law, to recover damages for a fraudulent transfer. *Bank of Am.*, 2015 IL App (1st) 132551, ¶ 87, 33 N.E.3d at 723.

Fraudulent intent in making a transfer may be inferred from the existence of certain factors, called "badges of fraud," that are laid out in Section 5(b) of the Illinois UFTA. *See Bank of Am.*, 2015 IL App (1st) 132551, ¶ 88, 33 N.E.3d at 724. Specifically, a court may consider whether:

(1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was disclosed or concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer

occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

740 ILCS 160/5(b)(1)–(11). A court need not consider all of the factors, but when "the factors are present in sufficient number, 'it may give rise to an inference or presumption of fraud.'" *See Bank of Am.*, 2015 IL App (1st) 132551, ¶ 89, 33 N.E.3d at 724. Courts applying Illinois law note, however, that the "presence of only one factor could entitle a party to relief." *Id.*

Plaintiff argues that a finder of fact can infer BRI Holding and Defendants' fraudulent intent from the following chain of inferences: in January 2015, Defendants and BRI Holding knew that "the price of oil was in precipitous decline," "the price decline seriously jeopardized the profitability of AAR, and by extension the flow of funds to BRI," "AAR Parent's balance sheet was underwater and dependent on a huge amount of booked 'goodwill' to keep it from reflecting facial insolvency," "AAR had a senior lender, Medley Capital, that had the power, in the event it felt insecure, to prevent AAR from making distributions upstream to investors," "a six-figure interest payment on the Note was due in April," and "a failure to make full, timely interest payments triggered acceleration of the Note." (Pl.'s Mem. in Opp'n at 14.) Given all this, Plaintiff claims, a reasonable jury could conclude that Defendants "decided to grab what they could" in January because "it was their last chance to ever get any money out of BRI." (*Id.*)

Defendants do not contest that the tax distribution was made to insiders of BRI Holding, nor that the distributions occurred shortly after BRI Holding made an interest payment on Plaintiff's promissory note. (Def.'s MSJ at 11.) But Defendants contest the factual accuracy of certain of Plaintiff's assertions, noting that it was not at all apparent in January 2015 that AAR would not be profitable. (Defs.' Reply [82] at 7.) First, Defendants note that AAR Parent was profitable at the end of 2014 despite the decline in oil prices, and it appeared that AAR would be profitable in 2015. (*Id.*) Accordingly, Defendants argue, a decline in oil prices alone is not enough to infer that Defendants knew that AAR's future distributions would be limited. Defendants also point out that oil prices made a slight recovery in the first half of 2015. Second, Defendants assert that AAR

was compliant with all of the covenants of its loan with Medley Capital as of January 2015, meaning that Medley Capital was not entitled to prevent distributions to AAR Parent's members. (*See* Manning Dep. 81:7–9.)  Third, as discussed above, Defendants argue that goodwill should be included in AAR Parent's valuation, so BRI Holding and AAR Parent were solvent at the time of the transfer.

Recognizing the factual disputes, but viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that (1) BRI Holding transferred the tax distributions to insiders, (2) the value of the consideration received by BRI Holding was not reasonably equivalent to the value of the assets transferred to Defendants, (3) BRI Holding became insolvent due to, or shortly after, the transfer of funds to Defendants, and (4) the transfer occurred shortly after a substantial debt was paid and before another substantial debt was due.  While the parties address only a few of the "badges of fraud" listed in 740 ILCS 160/5(b), Plaintiff may prevail based on the presence of only one factor so long as there is clear and convincing evidence of an actual intent to defraud or hinder Plaintiff from collecting on his note.  *See Bank of Am.*, 2015 IL App (1st) 132551, ¶ 89, 33 N.E.3d at 724.  Taken as a whole, a reasonable jury could conclude that BRI Holding intended to hinder Plaintiff's collection of interest due to him on the promissory note by transferring substantially all of its cash to Defendants.

Once the creditor has raised an inference of fraud, the "debtor and donee of the transfer have the burden of dispelling an implication of fraud."  *Id.*  Defendants attempt to rebut the inference of intent with two arguments.  First, they again argue that the transfer of tax distributions was consistent with BRI Holding's operating agreement.  But as the court discussed earlier, a reasonable jury could find that distributions were not mandatory, especially in a situation, as here, in which BRI Holding had an opportunity to reserve cash to ensure it could meet its future debt obligations.  Second, Defendants claim that Plaintiff's claim of fraud is baseless because Plaintiff himself, as a member of AAR Parent's board, approved the tax distribution from AAR Parent to its members, which included BRI Holding via its ownership of BRIP.  (Defs.' MSJ at 11.)  Plaintiff's

approval of the AAR Parent tax distribution does not by itself rebut an inference of fraud, however. There is no indication that tax distributions from AAR Parent were earmarked for further distribution to BRI Holding's members; Defendants could have used the money to ensure that BRI Holding would be able to satisfy its future debt obligations.  And assuming that the AAR tax distributions were indeed intended to be used to satisfy the BRI Holding tax obligations, Defendants have not demonstrated that they used an amount of money equivalent to the transfers to satisfy tax obligations attributable to AAR Parent's income.  *See Oakridge Nursing & Rehab Ctr.*, 2019 IL App (1st) 170806, ¶ 44, 128 N.E.3d at 407 (expressing an inability to conclude that the debtor had not transferred assets from accounts receivable only to avoid paying a judgment without evidence that the debtor "used the money from the accounts receivables to satisfy past rent or the early termination fee" of its lease).  Plaintiff is entitled to a jury determination of whether these circumstances constitute clear and convincing evidence of fraud.  The court therefore denies summary judgment on this claim as well.

## IV.    Piercing the Corporate Veil

Separate from his fraudulent transfer claims, Plaintiff seeks to pierce the corporate veil to hold Reschke and Bobb/AAR Investments personally liable for BRI Holding's obligations on the promissory note.  Illinois courts "are reluctant to pierce the corporate veil," *Benzakry v. Patel*, 2017 IL App (3d) 160162, ¶ 65, 77 N.E.3d 1116, 1131 (3d Dist. 2017), but shareholders may be held personally liable for a claim against a corporation "if the corporate form is used as a cloak or cover for fraud or illegality, to work an injustice, to defend crime, or to defeat an overriding public policy, or where necessary to achieve equity."  *Wachovia*, 674 F.3d at 751 (quotation omitted).  Under Illinois law, courts may pierce the corporate veil "when two separate prongs are met:  (1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) circumstances must be such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice."  *Id.* (quoting *Hystro Prods., Inc. v. MNP Corp.*, 18 F.3d 1384, 1388–89 (7th Cir. 1994)).

## A.    Unity of Interest and Ownership

To satisfy the first prong, a party bringing a veil-piercing claim "bears the burden of showing that the corporation is in fact a 'dummy or sham' for another person or entity."  *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 379 (7th Cir. 2008) (quoting *Jacobson v. Buffalo Rock Shooters Supply, Inc.*, 278 Ill. App. 3d 1084, 1088, 664 N.E.2d 328, 331 (3d Dist. 1996)).  Illinois courts consider several factors to determine whether there is a unity of interest and ownership:

> inadequate capitalization; failing to issue stock; failing to observe corporate formalities; failing to pay dividends; corporate insolvency; nonfunctioning corporate officers; missing corporate records; commingling funds; diverting assets to an owner or other entity to creditor detriment; failing to maintain an arm's-length relationship among related entities; and whether the corporation is a mere façade for a dominant owner.

*Wachovia*, 674 F.3d at 752 (citing *Fontana v. TLD Builders, Inc.*, 362 Ill. App. 3d 491, 503, 840 N.E.2d 767, 778 (2d Dist. 2005)).  Section 10 of the Illinois Limited Liability Act, states that the "failure of a limited liability company to observe the usual company formalities or requirements relating to the exercise of its company powers or management of its business is not a ground for imposing personal liability on the members or managers for liabilities of the company."  805 ILCS 180/10-10.  Nothing in the statute, however, "bars piercing of the corporate veil for other grounds." *In re Sec. Inv'r Prot. Corp. v. R.D. Kushnir & Co.*, 274 B.R. 768, 775 (Bankr. N.D. Ill. 2002).

Defendants point out that BRI Holding maintained a separate existence from its members: it filed tax returns, filed annual reports with the Illinois Secretary of State, paid an annual fee to remain in good standing, and maintained a corporate checking account.  (Defs.' MSJ at 14.)  Plaintiff contends that veil-piercing is nevertheless appropriate here.  He emphasizes three factors (factors that largely overlap with evidence in support of his fraudulent conveyance claims)—BRI Holding's inadequate capitalization, corporate insolvency, and diversion of assets to an owner to the detriment of its creditors.  (Pl.'s Mem. in Opp'n at 15.)  The court determined, above, that there

is a genuine issue of material fact regarding whether BRI Holding was insolvent at the time of the transfer to Defendants, and so turns to the other two factors.

To determine whether an LLC is adequately capitalized, the court compares "the amount of capital to the amount of business to be conducted and obligations to be fulfilled." *Wachovia*, 674 F.3d at 752 (quoting *Fiumetto v. Garrett Enters., Inc.*, 321 Ill. App. 3d 946, 959, 749 N.E.2d 992, 1005 (2d Dist. 2001)). "Adequate capitalization exists when a corporation has sufficient equity without considering loaned funds or encumbered assets" available to meet its debts. *Id.*; *Fontana*, 362 Ill. App. 3d at 504, 840 N.E.2d at 779 ("[S]hareholders should in good faith put at the risk of the business unencumbered capital reasonably adequate for the corporation's prospective liabilities."). Otherwise, "a corporation becomes a mere liability shield, rather than an independent entity capable of carrying on its own business." *Wachovia*, 674 F.3d at 752. Exactly how much equity is adequate depends on the facts of the case and the type of business in question, *Laborers' Pension Fund v. Lay-Com, Inc.*, 580 F.3d 602, 612 (7th Cir. 2009), and generally, the party arguing that a business is undercapitalized "must set forth evidence of what proper capitalization would be." *Bd. of Trustees of the Health & Welfare Dep't of the Constr. & Gen. Laborers' Dist. Council of Chicago & Vicinity v. Allison Enters., Inc.*, No. 12 C 4097, 2014 WL 4244211, at *11 (N.D. Ill. Aug. 27, 2014).

When determining whether a corporation is adequately capitalized, it is important to distinguish working capital from equity capital. *Laborers' Pension Fund*, 580 F.3d at 612. Working capital is "that portion of a firm's assets that are in relatively liquid form, such as cash, accounts receivable and inventory," while equity capital is "the excess of total assets over total liabilities." *Id.* "Undercapitalization is primarily concerned with unencumbered or equity capital, . . . describing the investment made by the shareholders at the establishment of a corporation." *Id.* This is because veil-piercing is an exception to limited liability, and if "the shareholders do not invest enough equity, . . . there is no basis for rewarding them by limiting their liability." *Id.* (citing

24

Frank H. Easterbrook & Daniel R. Fischel, *Limited Liability and the Corporation*, 52 U. CHI. L. REV. 89, 114 (1985)).

BRI Holding is, as its name indicates, a holding company, and Plaintiff has not provided evidence of what adequate capitalization of a holding company would be. Rather, Plaintiff argues that BRI Holding was inadequately capitalized because, from the outset, it had no unencumbered capital. *See Laborers' Pension Fund*, 580 F.3d at 612. While Defendants Reschke and Bobb each initially invested about $1.5 million into BRI Holding, and later made additional contributions up to $2.25 million each for a total of $4.5 million in cash invested, Plaintiff is correct that all of these cash contributions were quickly encumbered. BRIP, BRI Holding's subsidiary, purchased a 70 percent interest in AAR Parent using $12.5 million in cash and $2.5 million in the note from Plaintiff, but immediately had to pledge its interest in AAR Parent as collateral for the $100 million loan from Medley Capital. The $2.5 million promissory note from Plaintiff was a loan and cannot be included in considering whether BRI Holding was adequately capitalized, *see Wachovia*, 674 F.3d at 752. That is, BRI Holding was initially capitalized with roughly $3 million, all of which was almost immediately encumbered by the Medley Capital loan. BRI Holding also faced significant upcoming payment obligations on Plaintiff's promissory note, with no retained capital to pay those amounts. This suggests that BRI Holding was not adequately capitalized. *Cf. Bank of Am.*, 2015 IL App (1st) 132551, ¶ 107, 33 N.E.3d at 729. BRI Holding's failure to pay the April 2015 interest installment due on Plaintiff's promissory note, only seven months after BRI Holding was established, is additional evidence of inadequate capitalization. *See Laborers' Pension Fund*, 580 F.3d at 613 ("M.S. King's *failure* to meet its debts . . . was additional evidence that it *could not* pay its debts and was therefore undercapitalized."); *Benzakry*, 2017 IL App (3d) 160162, ¶ 66, 77 N.E.3d at 1132 ("It is inequitable for shareholders to establish and maintain a corporation that carries on business without sufficient assets available to meet its debt."). Plaintiff has raised a triable issue regarding whether BRI Holding was adequately capitalized.

As Plaintiff also notes, BRI Holding diverted its assets to insiders of the LLC—its members Reschke and Bobb.  Defendants do not dispute that BRI Holding distributed money to its insiders in January 2015 after receiving a tax distribution from AAR Parent, but argue that this situation is distinguishable from cases of corporate looting.  *See, e.g., Wachovia*, 674 F.3d at 753 (finding corporate looting after the price of a stock the company purchased on margin collapsed because it paid nearly $1.2 million to insiders or related entities rather than paying its creditors); *Steiner Elec. Co. v. Maniscalco*, 2016 IL App (1st) 132023, ¶ 58, 51 N.E.3d 45, 59–60 (1st Dist. 2016) (finding diversion of corporate assets when, at a time that the corporation had an outstanding debt, the owner allowed his son-in-law to take and use in his new business a customer list, valued at over $200,000, for no compensation).  Specifically, Defendants again assert that the distribution from BRI Holding to Defendants was made in the normal course of business and consistent with BRI Holding's operating agreement.  (Defs.'s Reply at 11.)  A tax distribution may be a legitimate justification for a transfer of funds to an insider, but as explained earlier, the tax distributions at issue here were not mandatory.  Given its large recurring interest obligations, BRI Holding could have retained funds to make future payments.  Plaintiff has presented no direct evidence that BRI Holding's payment of the tax distribution to Defendants was a deliberate effort to divert funds for the purpose of avoiding payments to Plaintiff, *cf. Bank of Am.*, 2015 IL App (1st) 132551, ¶ 113, 33 N.E.3d at 732, but, as discussed above, Plaintiff has at least raised an inference that Defendants intended to hinder Plaintiff's ability to collect interest, and the payments to Defendants meant that BRI Holding had no cash on hand to make future interest payments to Plaintiff.  Accordingly, a reasonable trier of fact could find that BRI Holding diverted assets to the detriment of its creditor.

## B.    Sanctioning Fraud or Promoting Injustice

The court finds that there is similarly an issue of material fact regarding whether "adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice."  *Wachovia*, 674 F.3d at 751.  That a creditor would otherwise be unable to collect on

its judgment against the debtor is not enough to justify piercing the corporate veil. *See Sea-Land Servs., Inc. v. Pepper Source*, 941 F.2d 519, 524 (7th Cir. 1993). Rather, the creditor must show that the debtor engaged in fraudulent conduct (that is, intentional wrongdoing), *id.* (quoting *Van Dorn Co. v. Future Chem. & Oil Corp.*, 753 F.2d 565, 570 (7th Cir. 1985)), or that an additional "wrong" would result, for example, that:

> the common sense rules of adverse possession would be undermined; former partners would be permitted to skirt the legal rules concerning monetary obligations; a party would be unjustly enriched; a parent corporation that caused a sub's liabilities and its inability to pay for them would escape those liabilities; or an intentional scheme to squirrel assets into a liability-free corporation while heaping liabilities upon an asset-free corporation would be successful.

*Id.* at 524. Plaintiff asserts that a failure to pierce the corporate veil would promote injustice by allowing Defendants to successfully "squirrel assets" to themselves while "heaping liabilities upon an asset-free corporation." (Pl.'s Mem. in Opp'n at 19.)

Whether adhering to corporate separateness promotes injustice "is best understood as asking whether there has been an abuse of limited liability." *On Command Video Corp. v. Roti*, 705 F.3d 267, 273 (7th Cir. 2013). One such abuse is "when the owner of a party to a contract strips the party of assets so that if it breaks the contract the other party will have no remedy." *Id.*; *see also Fusion Capital Fund II, LLC v. Ham*, 614 F.3d 698, 701–02 (7th Cir. 2010) (explaining that the laws of many jurisdictions permit holding "investors personally liable only in the sort of situations in which private negotiations fail," such as "when fraud spoils the voluntariness of the choice, when investors make net withdrawals from the corporation after the contract has been formed and thus frustrate its ability to keep its promises (a fraudulent conveyance if the corporation is insolvent, or the transfer makes it so), or when there were no negotiations (as with tort creditors)"). For example, in *Steiner Electric*, the Illinois Appellate Court pierced the corporate veil after finding that the debtor corporation's owner stripped the corporation of its assets and then closed the corporation "in response to [its creditor's] refusal to abandon its contractual rights." *Steiner*, 2016 IL App (1st) 132023, ¶ 68, 51 N.E.3d at 62. Defendants have not closed BRI

Holding,mand did not (as far as the record shows) pressure Plaintiff to abandon his claim on the promissory note by threatening to close. Plaintiff has nevertheless raised a genuine issue of material fact regarding whether Defendants, who controlled BRI Holding, abused BRI Holding's limited liability by deliberately stripping the LLC of its assets (via the alleged fraud-in-fact transfer) in a way that frustrated its ability to satisfy its debt obligations to Plaintiff.

Even if Defendants did deliberately strip BRI Holding of its assets, the Seventh Circuit has noted that "[t]here is no fraud or injustice, hence no basis for piercing a corporate veil, without reliance by the would-be piercer." *On Command Video*, 705 F.3d at 274. Defendants argue that "people who knowingly deal with a corporate entity without getting a guaranty cannot turn to its investors on an alter-ego or veil piercing theory." (Defs.' Reply at 12.) In particular, Defendants contend, Plaintiff understood that BRI Holding was a newly-formed holding company (Pl.'s SOF Resp. ¶ 36), was represented by counsel in the transaction, and nevertheless did not request that Defendants personally guaranty the note. (Defs.' Reply at 11.)

A creditor cannot "complain about having extended credit to an assetless corporation if he knew or should have known it was assetless." *On Command Video*, 705 F.3d at 274; *see also Fusion Capital*, 614 F.3d at 701 (finding no fraud when the plaintiff knew the defendant was "a husk without any corn inside"; that is, the fact that the defendant corporation (whose corporate veil the plaintiff sought to pierce) was thinly capitalized was "the reason why th[e] deal had been proposed and the dominant feature in the deal's structure," so the plaintiff could not claim to have been deceived by the defendant corporation's insolvency). *On Command Video* and *Fusion Capital* do not, however, suggest that one doing business with a thinly-capitalized corporation may never seek to pierce the corporate veil. Rather, the court in *Fusion Capital* explained that it did "not know of any statute or decision, in any American jurisdiction, holding that investors in a thinly capitalized corporation are personally liable for its debts to a contracting partner when that partner, *with knowledge of the corporation's insolvency*, signs without getting a guaranty from the investors." *Fusion Capital*, 614 F.3d at 702 (emphasis supplied).

28

The record here is mixed regarding whether Plaintiff was justified in relying on BRI Holding having assets. It is somewhat awkward for Defendants to argue, on the one hand, that Plaintiff should have known better than to deal with BRI Holding without getting a personal guaranty from its owners because it was insolvent or very likely to be unable to repay its obligation, while simultaneously arguing elsewhere that BRI Holding was indeed solvent in January 2015 when it made the tax distributions to Defendants. And unlike in *Fusion Capital* or *Tower Investors*, there is no indication in the record that Plaintiff attempted to benefit from BRI Holding's thin capitalization in such a way that his reliance on a separate LLC existence was clearly unjustified. But, as the court found earlier in this opinion, BRI Holding's solvency (as a result of AAR Parent's solvency) was questionable. Plaintiff was represented by counsel in his transaction with Defendants and presumably could have obtained more information about the company's finances or negotiated for a personal guaranty from Defendants rather than making an unsecured loan to a newly-formed holding company. *See Tower Inv'rs, LLC v. 111 E. Chestnut Consultants, Inc.*, 371 Ill. App. 3d 1019, 1034, 864 N.E.2d 927, 942 (1st Dist. 2007); *On Command Video*, 705 F.3d at 274–75. Finally, Plaintiff, as the CEO of AAR, had at least as much information as did anyone else involved in the transaction concerning the financial health of AAR (and accordingly, of BRI Holding's sole asset). Plaintiff disputes knowing that BRI Holding's sole source of revenue would be its interest in AAR Parent (*see* Janssen Dep. 69:15–70:17; Pl.'s SOF Resp. ¶ 6), but his position may not be convincing, in light of the access he had to information concerning AAR's finances.

The court nevertheless concludes there is a factual dispute regarding whether Plaintiff could reasonably expect BRI Holding to use the tax distribution to pay interest on his promissory note rather than paying a dividend to its members. *Cf. On Command*, 705 F.3d at 274. Defendants assert that Plaintiff approved the tax distribution from AAR Parent to its members, including to BRI Holding's wholly-owned subsidiary BRIP, and argue that there can be no injustice in permitting a tax distribution to Defendants when Plaintiff himself benefitted from it. True, the

purpose of the distribution from AAR Parent was to reimburse its members for paying taxes attributable to AAR's income, and payment of interest on a promissory note is not payment of taxes. But BRI Holding's use of the January 2015 tax distributions to pay the first interest installment on Plaintiff's note suggests that the distributions were not earmarked solely for payment to the IRS or to BRI Holding's members. In sum, there is a disputed issue of fact regarding whether Plaintiff was justified in relying on BRI Holding as an entity having assets sufficient to meet its obligations on the promissory note, and accordingly whether "adherence to the fiction" of BRI Holding's separate LLC existence would "sanction a fraud or promote injustice." *Wachovia*, 674 F.3d at 751.

## CONCLUSION

Viewing the record in the light most favorable to Plaintiff Janssen, there are genuine issues of material fact regarding each of Plaintiff's four claims against Defendants that prevent the court from granting summary judgment. Defendant Reschke and Defendant Bobb/AAR Investments, LLC's motion for summary judgment [73] is denied. Status hearing set for 3/25/2020 at 9:00 a.m.

ENTER:

Date: March 11, 2020

_____
REBECCA R. PALLMEYER
United States District Judge