**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ASH JANSSEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 17 C 8625** |
| | ) | |
| | ) | **Judge Rebecca R. Pallmeyer** |
| **MICHAEL W. RESCHKE and BOBB/AAR** | ) | |
| **INVESTMENTS, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

In September 2014, Plaintiff Ash Janssen sold a portion of his business, All Around Roustabout, LLC ("AAR"), to BRI Holding, LLC, extending a $2.5 million loan to BRI for part of the purchase price. After the first interest payment in January 2015, BRI failed to make quarterly payments on the loan as required, and Janssen obtained a judgment against BRI Holding in a lawsuit before Judge Blakey of this court (No. 16 C 10098). In this lawsuit, Janssen seeks to collect the debt from BRI Holding's owners, Defendants Michael W. Reschke and Bobb/AAR Investments, LLC ("Bobb"). In addition to a veil-piercing argument, Janssen contends Reschke and Bobb received fraudulent transfers from BRI Holding. (*See* Am. Compl. [13] ¶¶ 1–2.) The transfers alleged to be fraudulent stem from a $2,718,159 distribution from AAR to its members to offset their income tax liability attributable to the business. Of this distribution, Bobb received $481,517 and Reschke received $480,554 through BRI Holding. In March of this year, the court denied [87] Defendants' motion for summary judgment [73], finding that Plaintiff had identified factual disputes precluding summary judgment on each of his four claims against Defendants. Defendants now seek reconsideration [92] of the court's opinion, citing new evidence and asserting that the court misunderstood an argument they made in opposition to Plaintiff's veil-piercing claim. For the reasons explained below, Defendants' motion for reconsideration is granted in part and denied in part.

## BACKGROUND

The court assumes familiarity with its order denying summary judgment [87] and will not repeat in detail the factual background of this dispute. In summary, AAR is a business that provides services such as storage and sanitation to support its customers' oil drilling activity. (Defs.' Resp to Pl.'s Local Rule 56.1 Statement of Additional Facts ("Defs.' SOF Resp.") [81] ¶ 5.) On September 30, 2014, Plaintiff Ash Janssen, the then-CEO of AAR, and his business partner, Josh Wells, transferred their 100 percent membership interest in AAR to a holding company, AAR Parent, LLC, via another limited liability company in which AAR Parent had a 100 percent interest, AAR Intermediate Holding, LLC. (Pl.'s Resp. to Defs.' Local Rule 56.1 Statement of Facts ("Pl.'s SOF Resp.") [76] ¶¶ 6–7.) Also on September 30, 2014, BR Investment Partners, LLC ("BRIP"), an Illinois limited liability company, acquired as its sole asset a 70 percent membership interest in AAR Parent. (*Id.* ¶¶ 5, 8, 17.) The remaining 30 percent was acquired by Janssen and Wells as a condition of the sale. (Defs.' SOF Resp. ¶ 6.) AAR Parent was managed by a board which included Plaintiff Janssen, Defendant Reschke, and Robert J. Bobb, who owns and controls Defendant Bobb/AAR Investments, LLC. (Pl.'s SOF Resp. ¶ 10.) BRIP (again, the 70 percent owner of AAR Parent) is wholly owned by BRI Holding, LLC, an Illinois limited liability company founded on September 18, 2014, and controlled by the Defendants in this case. (Defs.' SOF Resp. ¶¶ 1, 11.) Defendant Michael W. Reschke owns a 49.9 percent interest in BRI Holding, Defendant Bobb/AAR Investments, LLC owns a 50 percent interest, and Defendant Reschke's son, Michael W. Reschke, Jr., owns the remaining 0.1 percent interest. (Pl.'s SOF Resp. ¶¶ 1–2, 6.) BRI Holding was initially capitalized with $1.498 million from Reschke, $1,500 from Michael W. Reschke, Jr., and $1.5 million from Bobb. (*Id.* ¶ 6; Defs.' SOF Resp. ¶ 11.)

At the time of the sale, AAR was valued at around $100 million, and the transfer of Janssen and Wells' ownership of AAR to AAR Parent was funded with a $100 million loan to AAR Intermediate (guaranteed by AAR Parent) from Medley Capital Corporation, an unrelated bank. (Pl.'s SOF Resp. ¶¶ 7; Defs.' SOF Resp. ¶¶ 9; *see also* Manning Dep. [76-9] 21:3–6; Bobb Dep.

[76-5] 25:14–22.) AAR Parent paid $20 million on the loan before defaulting in late 2015. (Pl.'s SOF Resp. ¶ 26.) The subsequent transfer of a 70 percent ownership interest in AAR Parent (and therefore, indirectly, a 70 percent interest in AAR) to BRIP was funded by additional cash contributions from Reschke and Bobb, $8 million in cash from unidentified outside investors, and a $2.5 million unsecured loan from Janssen to BRIP via BRI Holding. (Defs.' SOF Resp. ¶ 11.) Janssen's loan was evidenced by a five-year promissory note ("Note"), maturing on September 30, 2019 and requiring quarterly interest payments at a rate of 20 percent per year. (*Id.* ¶ 13; Pl.'s SOF Resp. ¶ 9.) BRI Holding's sole asset was its 100 percent ownership interest in BRIP; and cash distributions from BRIP, via the 70 percent indirect interest in AAR, were BRI's only source of revenue. (Pl.'s SOF Resp. ¶¶ 17–18.) BRIP pledged its 70 percent interest in AAR Parent as collateral to secure the $100 million loan from Medley Capital. (*Id.* ¶ 8.)

At the heart of this dispute are transfers from BRI Holding to Reschke and Bobb in January 2015. The entities involved in this dispute are limited liability companies that are taxed as partnerships, meaning that business income is not taxed at the entity level, but instead all tax liability is passed through to the individual members. (*Id.* ¶ 11; Defs.' SOF Resp. ¶ 2.) Accordingly, each member pays income tax attributable to AAR's income on that member's individual tax return. (Pl.'s SOF Resp. ¶ 11.) To offset their members' tax burdens, AAR Parent, BRIP, and BRI Holding each have tax distribution policies that permit the LLC to distribute to its members an amount of money equal to the estimated taxes each member will have to pay. (*Id.* ¶ 12, 14.) In January 2015, AAR Parent made a tax distribution to its members based on AAR's estimated fourth-quarter 2014 taxable income of $12,059,548.[1] (*Id.* ¶ 13.) Janssen and Wells each received 15 percent of the tax distribution while BRIP received 70 percent. (*Id.*) BRIP distributed $1,089,034 of its tax distribution to BRI Holding, which used part of the funds to pay $125,000 in interest on Janssen's Note and transferred the remainder to Reschke and Bobb. (*Id.*

---

[1] AAR Parent's 2014 federal tax returns reflect actual taxable income of $9,973,943 based on revenue of $39,749,342. (Pl.'s SOF Resp. ¶ 20.)

¶¶ 15–16; Defs.' SOF Resp. ¶ 16.) Although AAR had $23,268,740 in revenue and $5,303,746 in earnings before interest, taxes, depreciation and amortization ("EBITDA") for the quarter ending on March 31, 2015 (Pl.'s SOF Resp. ¶ 21), after January 2015, AAR made no further distributions to its members. (Defs.' SOF Resp. ¶ 22.) The parties attribute the lack of distributions to the decline in oil drilling activity by AAR's customers in response to a decline in oil prices beginning in 2014. (*Id.* ¶¶ 22–25.) Additionally, after the first $125,000 payment on Janssen's Note in January 2015, BRI Holding made no further interest payments and has paid no portion of the principal. (*Id.* ¶ 18; Pl.'s SOF Resp. ¶¶ 16, 28.)

**I.      The Representation Letter**

On March 29, 2020, after the court issued its decision denying Defendants' motion for summary judgment, Richard Manning, the former Chief Financial Officer of AAR, sent an email to counsel for Defendants. (Mem. in Supp. of Mot. for Recons. ("Recons. Mem.") [93] at 2.) Attached to the email were documents in Manning's file related to the report from an independent audit of the 2014 financial statements of AAR Parent and its subsidiaries, performed by McGladrey, LLC. (*See* Manning Aff. ¶¶ 2–3, Ex. B to Recons. Mem. [93].) These documents included a management letter ("Representation Letter") dated April 30, 2015 and signed by Janssen, Manning, and Kim Shearer, AAR Parent's Controller, on behalf of AAR Parent, LLC. (*See id.* ¶ 2; Representation Letter at 1, 4, Ex. A to Manning Aff.) The Representation Letter confirms that McGladrey completed the audit for the purpose of "expressing an opinion on whether [AAR Parent's] consolidated financial statements are presented fairly, in all material respects, in accordance with accounting principles generally accepted in the United States (U.S. GAAP)." (Representation Letter at 1.)

In the Representation Letter, Janssen, Manning, and Shearer (collectively, "management") confirmed, "to the best of [their] knowledge and belief," the truth of several financial matters as of the date of the letter, April 30, 2015. (*Id.*) The Letter affirms that the financial records are complete, in that all transactions were recorded in the accounting records

4

and were reflected in the financial statements. (*Id.* ¶ 11.) Management confirmed, further, that they had fulfilled their responsibility (evidently set forth in a document not in the record) to prepare and fairly present the consolidated financial statements in accordance with U.S. GAAP. (*Id.* ¶ 1.) They also acknowledged their responsibility for designing, implementing, and maintaining internal control mechanisms to prepare and fairly present consolidated financial statements free from material misstatement, and to prevent and detect fraud. (*Id.* ¶¶ 2–3.) Management confirmed that they had informed the auditor of "all uncorrected misstatements" in the consolidated financial statements for the period from October 1, 2014 through December 31, 2014, and stated their belief that any such misstatements were immaterial in the sense that it was not "probable that the judgment of a reasonable person relying on the information would be changed or influenced by the omission or misstatement." (*Id.* ¶ 9.) Moreover, Janssen, Manning, and Shearer confirmed that "[a]ll events subsequent to the date of the financial statements and for which U.S. GAAP requires adjustment or disclosure have been adjusted or disclosed." (*Id.* ¶ 6.)

In the Letter, Janssen and the other managers confirmed the reasonableness of assumptions used to value assets and noted their agreement with any expert valuations. Specifically, the letter confirms that "[s]ignificant assumptions used by us in making accounting statements, including those measured at fair value, are reasonable and reflect our judgment based on our knowledge and experience about past and current events and our assumptions about conditions we expect to exist and courses of action we expect to take." (*Id.* ¶ 4.) They also agreed with "the findings of specialists in evaluating the valuation of fixed assets and intangible assets and have adequately considered the qualifications of the specialist in determining the amounts and disclosures used in the financial statements and underlying accounting records." (*Id.* ¶ 23.) Finally, the Representation Letter discloses that management did "not believe any impairment of goodwill exists as of December 31, 2014."[2] (*Id.* ¶ 20.) They tested goodwill for

---

[2] The audit, discussed in more detail below, states that the financial statements were prepared in accordance with U.S. GAAP, and specifically refers to the Financial Accounting

impairment based on the assumptions of a discount rate of 28.3 percent, an anticipated revenue decline of 16.75 percent in 2015 and anticipated revenue increases of 10 percent each year from 2016 to 2019, as well as a terminal growth rate of 3 percent.  (*Id.* ¶ 21.)

## II.    The Independent Audit Report

With their motion for summary judgment, Defendants submitted the April 30, 2015 report from an independent audit of AAR Parent's financial statements completed by McGladrey, LLP.[3] The Audit Report was an exhibit to Richard Manning's declaration and is the subject of the Representation Letter attached to Manning's March 29, 2020 email to Defendants' counsel.  The document opens with a summary "Independent Auditor's Report" explaining the scope of the audit, management's responsibility for the financial statements, the auditor's responsibilities, and the auditor's opinion.  (*See* Audit Report at 1–2.)  McGladrey audited AAR Parent's consolidated balance sheet as of December 31, 2014 and related consolidated financial statements for October 1, 2014 through December 31, 2014.  (*Id.* at 1.)  AAR Parent's management was responsible for

---

Standards Board's ("FASB") Accounting Standards Codification ("ASC").  (*See* Audit Report at 8, Ex. 2 to Manning Decl. [75-1].)  FASB is an organization that establishes financial accounting and reporting standards for companies that follow U.S. GAAP, *see Selbst v. McDonald's Corp.*, No. 04 C 2422, 2005 WL 2319936, at *10 n.11 (N.D. Ill. Sept. 21, 2005), and the court may take judicial notice of FASB's ASC and Accounting Standards Updates ("ASU").  *See* FED. R. EVID. 201(b)(2); *see also, e.g., Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 912 (N.D. Cal. 2015); *Takara Tr. v. Molex Inc.*, 429 F. Supp. 2d 960, 963, 975, 978 (N.D. Ill. 2006).  The FASB defines impairment of goodwill as "the condition that exists when the carrying amount of goodwill exceeds its implied fair value."  ASC 350-20-35-2; *see also* FASB, *Carrying Amount*, http://asc.fasb.org/glossary (last visited Sept. 8, 2020) ("The amount of an item as displayed in the financial statements."), *Fair Value* ("The price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.").  Because the "fair value of goodwill can be measured only as a residual and cannot be measured directly," ASC 350-20-35-2, companies compare the fair value of the reporting unit, or the whole entity in AAR's case, to its carrying amount including goodwill.  ASC 350-20-35-4–13; *see also* ASU No. 2014-02 at 2.  If the carrying amount is "greater than zero and its fair value exceeds its carrying amount," goodwill is not impaired.  ASC 350-20-35-6.

[3]      Defendants ask the court to consider McGladrey and Richard Manning to be experts.  (Recons. Mem. at 4–5.)  Plaintiff is correct that neither is an expert witness for purposes of this motion.  Plaintiff states, and Defendants do not dispute, that neither McGladrey nor Manning were disclosed to Plaintiff as experts as required by Federal Rule of Civil Procedure 26.  *See* FED. R. CIV. P. 26(a)(2).  Additionally, Manning's affidavit is not equivalent to a written report of his opinions, *see* FED. R. CIV. P. 26(a)(2)(B), and, as an entity, McGladrey cannot testify.

preparing and fairly presenting the consolidated financial statements in accordance with U.S. GAAP, while McGladrey was responsible for expressing an opinion on the consolidated financial statements based on the audit, including whether the financial statements were free from material misstatement, the appropriateness of AAR's accounting policies, and the reasonableness of management's significant accounting estimates. (*Id.*) McGladrey concluded that AAR Parent's consolidated financial statements "present fairly, in all material respects, the financial position of AAR Parent, LLC and its subsidiaries as of December 31, 2014, and the results of its operations and its cash flows for the period from October 1, 2014 through December 31, 2014, in accordance with [U.S. GAAP]." (*Id.* at 2.)

The consolidated balance sheet as of December 31, 2014 shows $143,336,344 in total assets, including $81,554,875 in net goodwill, along with $124,026,956 in total liabilities, leaving $19,309,388 in members' equity. (*Id.* at 3.) The consolidated statement of income for October 1 through December 31, 2014 shows revenue of $32,672,597, gross profit of $13,074,850, and net income attributable to AAR Parent and subsidiaries of $533,127. (*Id.* at 4.) The consolidated statement of cash flows shows that AAR Parent had $8,529,748 in cash at the end of the audit period. (*Id.* at 6.) The Audit Report also describes how AAR Parent accounts for goodwill[4] under ASC 350. (*Id.* at 10.) Beginning October 1, 2014, AAR Parent elected the accounting alternative in ASU No. 2014-02, *Intangibles—Goodwill and Other (Topic 350)*, https://www.fasb. org/jsp/FASB/Document_C/DocumentPage?cid=1176163744355&acceptedDisclaimer=true (last visited Oct. 11, 2020). This accounting alternative permits companies to amortize goodwill on a straight-line basis over a period of 10 years and requires companies to test "goodwill for impairment only upon the occurrence of events or circumstances that may indicate the fair value

---

[4] The Audit Report states that "[t]angible and intangible assets acquired and liabilities assumed are recorded at fair value and goodwill is recognized for any excess of the price of the acquisition over the fair value of the net assets acquired." (Audit Report at 10.) The report continues that "[g]oodwill represents the assembled workforce and expected earnings growth of the Company." (*Id.* at 12.)

of the entity is less than its carrying value."[5]  (Audit Report at 10.)  The report states further that AAR Parent tests for goodwill impairment at the entity level (*id.*), and notes that AAR Parent determined that some, unspecified, indicators of impairment were present as of December 31, 2014, and prepared an impairment test.  (*Id.*)  As recounted above, this test incorporated the assumptions of a discount rate of 28.3 percent, an anticipated revenue decline of 16.75 percent in 2015 and anticipated revenue increases of 10 percent each year from 2016 to 2019, and a terminal growth rate of 3 percent.  (Representation Letter ¶ 21.)  AAR Parent concluded that there was no impairment of goodwill.  (Audit Report at 10.)

Also relevant here, the Report describes the quarterly distributions AAR Parent makes to its members to cover their personal tax liability.  (*Id.* at 20.)  The $2,718,159 in distributions at issue in this case had been declared as of December 31, 2014 and the amount was included as an accrued liability[6] in the consolidated balance sheet.  (*Id.*)  That is, the audited financial statements take the tax distributions into account when calculating assets, liabilities, and member equity.  (*Id.*)  Finally, the Audit Report notes under the heading "concentrations of credit risk," that 61.5 percent of the revenue for the audit period came from just one customer.  (*Id.* at 11.)  McGladrey stated that "[l]oss of this customer could have a material impact on the Company's operations and financial position."  (*Id.*)

### III.    Motion for Reconsideration

In denying Defendants' motion for summary judgment, this court concluded that there were disputed factual issues related to the financial condition of AAR Parent, and by extension BRI Holding, at the time of the tax distributions that precluded summary judgment on Plaintiff's first two fraudulent transfer claims.  There was also a factual dispute regarding whether the

---

[5]      *See* note 2, *supra*.

[6]      An accrued liability is "[a] debt or obligation that is properly chargeable in a given accounting period but that is not yet paid."  *Accrued Liability*, BLACK'S LAW DICTIONARY (11th ed. 2019).

distributions from BRI Holding to Defendants were made with an intent to hinder, delay, or defraud BRI Holding's creditors, making summary judgment on Plaintiff's third fraudulent transfer claim inappropriate. Finally, the court determined that there were material factual disputes related to Plaintiff's veil-piercing claim; specifically, whether there was a unity of interest and ownership between BRI Holding and Defendants as well as whether refusing to pierce BRI Holding's corporate veil would sanction fraud or promote injustice. Defendants seek reconsideration of this court's denial of summary judgment on Plaintiff's fraudulent transfer claims, relying on the Representation Letter and the context it offers for the Audit Report to support their position that BRI Holding was solvent when it made the challenged transfers to Reschke and Bobb in January 2015. Plaintiff denies that the Representation Letter supports a finding of solvency, and argues that it, in fact, supports his position that AAR, and by extension BRI Holding, was experiencing grave financial difficulties in January 2015.

Defendants also seek reconsideration of this court's finding that factual issues precluded summary judgment on Plaintiff's claim seeking to pierce BRI Holding's corporate (LLC) veil to hold Reschke and Bobb personally liable for non-payment of the Note. Defendants believe that the court misunderstood an argument they made in opposition to Plaintiff's claim that failing to pierce BRI Holding's corporate veil would sanction fraud or promote injustice. The court initially understood Defendants to argue that no fraud or injustice would result from declining to hold them personally liable for Janssen's Note because Plaintiff could not have reasonably expected that BRI Holding was capable of meeting its debt obligations given Plaintiff's alleged knowledge that BRI Holding was a newly-formed holding company and his failure to obtain a personal guaranty from Defendants. Plaintiff agrees that the parties never briefed the issue of reliance in the veil-piercing context, but opposes Defendants' motion for reconsideration, arguing that Defendants could have made a non-reliance argument earlier and it therefore is not an appropriate reason for this court to reconsider its ruling.

9

## LEGAL STANDARD

Because the court has not yet entered final judgment in this case, Federal Rule of Civil Procedure 54(b) governs Defendants' motion for reconsideration. *See Dahlstrom v. Sun-Times Media, LLC*, 346 F. Supp. 3d 1162, 1167 (N.D. Ill. 2018). Motions to reconsider are disfavored, but a court may alter or amend its judgment if the moving party can "'clearly establish' that the court committed a manifest error of law or fact or that newly discovered evidence precluded entry of judgment."[7] *Sec. & Exch. Comm'n v. Goulding*, No. 09 C 1775, 2020 WL 1445619, at *2 (N.D. Ill. Mar. 25, 2020) (quoting *Harrington v. City of Chi.*, 433 F.3d 542, 546 (7th Cir. 2006)). The "disappointment of the losing party" does not demonstrate a manifest error; rather, it is the "wholesale disregard, misapplication, or failure to recognize controlling precedent." *Birdo v. Gomez*, 214 F. Supp. 3d 709, 714 (N.D. Ill. 2016) (quoting *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000)). This occurs, for example, "when a district court 'has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Birdo*, 214 F. Supp. 3d at 714 (quotations omitted). A motion to reconsider "does not allow a party to revisit strategic decisions that prove to be improvident, to reargue the evidence, to make new arguments,

---

[7]     Defendants argue that the standard for reconsideration of an interlocutory order is less stringent than for review of a final order. (Recons. Mem. at 1.) In support, Defendants cite *Gridley v. Cleveland Pneumatic Co.*, 127 F.R.D. 102 (M.D. Pa. 1989) and *Digital Equipment Corp. v. Uniq Digital Technologies, Inc.*, No. 88 C 0644, 1995 WL 12297 (N.D. Ill. Jan. 11, 1995). (*See* Defs.' Recons. Reply [98] at 4.) In *Gridley*, the court expressly stated that the standard for considering new evidence after an interlocutory order "is less stringent than the one we would use if there were a final judgment in this case." 127 F.R.D. at 104. In *Digital Equipment Corp.*, the court stated that "interlocutory orders may be reconsidered by a district court when to do so is 'consonant with justice,'" but did not state that it was applying a less stringent standard, nor does the opinion appear to apply a different standard than that used to review motions seeking reconsideration of final orders. 1995 WL 12297, at *1. Other courts in this Circuit explain that, while district courts have "inherent authority to modify interlocutory orders," they should "be loath to do so in the absence of extraordinary circumstances." *U.S. S.E.C. v. Nat'l Presto Indus., Inc.*, No. 02 C 5027, 2004 WL 1093390, at *1 (N.D. Ill. Apr. 28, 2004); *see also, e.g., Dahlstrom*, 346 F. Supp. 3d at 1167; *Saunders v. City of Chicago*, 146 F. Supp. 3d 957, 961 (N.D. Ill. 2015).

or to introduce new evidence that could have been presented earlier." *Id.* (quotation omitted). Instead, such motions are "reserved for circumstances where the moving party has shown 'good reason' to set the judgment aside in the interest of justice." *Goulding*, 2020 WL 1445619, at *2 (citing *Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009)).

## DISCUSSION

### I. Reconsideration of BRI Holding's Solvency

In its ruling on Defendants Reschke and Bobb's motion for summary judgment, this court found that there was a genuine issue of material fact regarding whether BRI Holding was solvent at the time it made the transfer to Defendants, or whether it was rendered insolvent by that transfer.[8] Defendants now request that the court reconsider its earlier opinion because, they argue, newly discovered evidence supports their argument that BRI Holding was in fact solvent at the relevant time. In support of their motion for summary judgment, Defendants attached audited financial statements for AAR Parent and its subsidiaries. These financial statements show that AAR Parent had assets that exceeded its liabilities for the period of October 1, 2014 to December 31, 2014, although about $81.6 million of AAR Parent's total assets consisted of booked goodwill. After the court denied Defendants' motion for summary judgment, Manning sent to Defendants' counsel the Representation Letter from AAR Parent's management to McGladrey confirming the audit.[9] Defendants assert that, by signing this Letter, Plaintiff has admitted that goodwill was properly accounted for in AAR Parent's audited 2014 financial statements, and

---

[8] Courts occasionally collapse multilevel transactions like the one here—the tax distribution was forwarded from AAR Parent through BRIP to BRI Holding and eventually to Defendants—and treat them as a single transaction to determine if there was a fraudulent transfer. *See Daley v. Chang* (*In re Joy Recovery Tech. Corp.*), 286 B.R. 54, 74 (Bankr. N.D. Ill. 2002). The parties did not brief whether that would be appropriate in this case nor how collapsing the transaction would affect the fraudulent transfer analysis.

[9] Janssen admits the authenticity of the Representation Letter and that he signed it, although he considers the document to be "nothing more than AAR Parent's standard confirmation of certain matters at the request of the company's auditors." (Janssen Decl. ¶¶ 5, 8–9, Ex. B to Pl.'s Recons. Resp. [97-2].)

therefore, that AAR Parent was solvent when BRI Holding approved the distributions to Reschke and Bobb in January 2015. (Recons. Mem. at 3.) Plaintiff responds that the Representation Letter is not new evidence and therefore does not merit reconsideration of the court's order denying summary judgment. In any case, Plaintiff argues that the Representation Letter does not alter the court's earlier reasoning. (Pl.'s Resp. to Defs.' Mot. for Recons. ("Pl.'s Recons. Resp.") [97] at 2.)

### A. Whether the Representation Letter is Newly Discovered Evidence

As an initial matter, Plaintiff objects to the court's consideration of the Representation Letter, arguing that Defendants did not use the proper procedure to submit the document. (*Id.* at 4.) In Plaintiff's view, the "proper vehicle for submitting these documents would be through an amended or supplemental Rule 56.1 Statement of Material Facts." (*Id.*) Plaintiff cites no authority in support of the proposition that a party must comply with Local Rule 56.1 in a motion to reconsider denial of summary judgment, instead referring only to an unreported decision addressing the requirements of Local Rule 56.1 in the context of a motion for summary judgment. (*See id.* at 4–5 (citing *Henderson v. Brown*, No. 08 C 3172, 2010 WL 3861056 (N.D. Ill. Sept. 27, 2010).) Plaintiff explains that, had Defendants complied with Local Rule 56.1, Plaintiff would have been better able to respond to the new evidence with the "formalities and protections" the Rule affords, and Plaintiff could have provided new evidence of his own. (Pl.'s Recons. Resp. at 4–5.) Plaintiff did, however, attach exhibits to his response memorandum, including portions of depositions not previously included in the record, and has not explained how his response would have differed had Defendants complied with Local Rule 56.1. Plaintiff's objection is overruled.

A party may seek reconsideration of a court's ruling based on the discovery of new evidence. Such motions cannot "be employed as a vehicle to introduce new evidence that could have been adduced during the pendency of the summary judgment motion." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996) (citation omitted). "To support a motion for reconsideration based on newly discovered evidence, the moving party must

'show not only that this evidence was newly discovered or unknown to it until after the hearing, but also that it could not with reasonable diligence have discovered and produced such evidence [during the pendency of the motion].'" *Id.* (citation omitted alteration in original).

In their opening brief in support of their motion for reconsideration, Defendants explain that they did not attach the Representation Letter as an exhibit to their motion for summary judgment because Plaintiff did not produce the document in response to a discovery request and neither Defendant had the letter in his own files prior to moving for summary judgment. (Recons. Mem. at 2.) Then, in response to Plaintiff's brief opposing reconsideration, Defendants explain that they did not initially seek more thorough audit-related discovery from Richard Manning because Plaintiff first raised the issue of AAR and BRI Holding's solvency during summary judgment briefing and after the close of discovery. (Defs.' Recons. Reply at 2.) Specifically, they note that in Count I of his amended complaint, Plaintiff alleged only that BRI Holding was presumed insolvent because it was allegedly not paying its debts as they became due. (*Id.*) In Defendants' view, because Plaintiff raised the issue of whether those entities were, in fact, insolvent for the first time in his response brief on summary judgment, Defendants could not have foreseen a need for solvency-related discovery. (*Id.* at 2–3.)

The rationale behind Defendants' failure to raise this issue until their reply brief on a motion for reconsideration is not clear to the court. True, a plaintiff may not attempt to amend his complaint in a response to a motion for summary judgment by adding new claims or new factual allegations. *See Whitaker v. Milwaukee Cty., Wis.*, 772 F.3d 802, 808 (7th Cir. 2014); *see also Wachovia Sec., LLC v. Neuhauser*, 528 F. Supp. 2d 834, 848 (N.D. Ill. 2007). Defendants did not, however, object or move to strike the purportedly new theory underlying Plaintiff's fraudulent transfer claims during summary judgment briefing. Instead, Defendants stated "[i]ncredibly, Janssen now claims that both AAR Parent and BRI were insolvent on January 12, 2015 when BRI made its tax distributions to its members," before responding to Plaintiff's solvency argument using the same evidence advanced in their opening brief. (Defs.' Mot. for Summ. J. Reply ("Defs.'

13

MSJ Reply") [82] at 5.)  In any case, the court is not persuaded that Defendants had no notice that solvency would be an issue in this litigation.  Plaintiff's amended complaint includes four counts and the solvency of AAR, AAR Parent, and BRI Holding is directly or indirectly relevant to each of them.  Even if Plaintiff only directly raised the presumption of insolvency in his complaint, Defendants could have anticipated based on the alleged causes of action that the financial condition of AAR, AAR Parent, and BRI Holding would be relevant.  *Cf. Neuhauser*, 528. F. Supp. 2d at 849.

Whether or not Defendants should have recognized that solvency would be an issue in this litigation, the court must address the parties' primary dispute: whether the Representation Letter was "readily available" to Defendants during discovery.  *See Goulding*, 2020 WL 1445619, at *6 (citing *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 202 n.5 (7th Cir. 1994)) ("Where a party is made aware that a particular issue will be relevant to its case but fails to produce readily available evidence pertaining to that issue, the party may not introduce the evidence to support a [motion to reconsider].").  Plaintiff contends that the "Representation Letter is not 'new evidence' as that term is used for purposes of a motion to reconsider" because "Defendants could have easily obtained the Representation Letter in time to use it with their summary judgment filings had they exercised even a minimum level of diligence in discovery." (Pl.'s Recons. Resp. at 5–6.) Plaintiff explains that Defendants could have "subpoenaed records from AAR Parent and McGladrey," or "could have timely sought to obtain documents from Manning." (*Id.* at 7.)  With respect to whether Plaintiff himself should have produced the Representation Letter, Plaintiff acknowledges that the Letter falls within the scope of discovery requested by Defendants but states that he did not improperly withhold the Letter because he no longer had it in his personal possession.[10] (*Id.* at 6.)  Plaintiff does not deny, however, that he could have accessed the Letter

---

[10]    Defendants do not dispute Plaintiff's assertion that he had not been CEO of AAR for years by the time he received the discovery request and did not retain copies of all of AAR Parent's documents.  (Pl.'s Recons. Resp. at 6; *see also* Janssen Decl. ¶¶ 7–8; Defs.' Recons. Reply at 2.)

himself months ago, nor does he dispute that Reschke and Bobb had not seen the Representation Letter prior to Manning's email and were not aware it existed before March 29, 2020. (*Id.*) Instead, Plaintiff seems to suggest that Defendants somehow should have discerned the existence of the Representation Letter from Manning's deposition testimony that he reviewed monthly financial statements of AAR to prepare for his deposition, and that, while working as CFO of AAR, he "interfac[ed] with the public accounting firm for an annual audit," and was the "primary liaison" between AAR and the outside auditors for the Audit Report. (*Id.*)

Plaintiff cites no authority in support of these arguments, and the court is not persuaded that a party should be expected to request or subpoena unknown documents from nonparties, especially when that document fell within the scope of a discovery request to the opposing party and was not produced. *Cf. Oto*, 224 F.3d at 606 (explaining that the third-party defendant could easily have subpoenaed the plaintiff's business records). Defendants have not disclosed what prompted Manning to send the March 29, 2020 email, nor why Manning did not supply the Representation Letter with his initial declaration in support of Defendants' summary judgment motion. But Manning is not a party in this litigation, and the fact that the Representation Letter was in Manning's possession at the time that Defendants filed their motion for summary judgment does not mean that it was readily available to Defendants at that time. Perhaps Defendants should have asked Manning to provide all of his audit-related documents with his declaration, but it is undisputed that neither Defendant knew the Representation Letter existed and that they did not possess or control the Letter prior to filing their motion for summary judgment. *Cf. Curry v. Chateau del Mar, Inc.*, No. 07 C 6021, 2008 WL 5387118, at *1 (N.D. Ill. Dec. 22, 2008) (declining to consider new evidence because, even though the defendant did not have the documents when it filed a motion to dismiss, the material facts from the documents were all known to the defendant prior to the court's ruling); *Holliday v. Bd. of Trustees of S. Illinois Univ. Governing S. Illinois Univ. Edwardsville*, No. 04-CV-237-MJR, 2008 WL 894973, at *3–4 (S.D. Ill. Mar. 31, 2008) (declining to consider new exhibits because the plaintiff did not explain why she was previously unable to

secure or produce the documents or contact potential witnesses for their testimony). Plaintiff's objection to the court's consideration of the Representation Letter is overruled.

### B. The Significance of the Representation Letter

In their summary judgment briefs, both parties treated the financial status of AAR Parent and AAR as the primary indicator of BRI Holding's solvency at the time of the subject transfers. (*See* Mem. in Supp. Mot. Summ. J. ("Defs.' MSJ Mem.") [74] at 8–9 (offering AAR Parent's tax and financial documents as evidence of BRI Holding's solvency); Pl.'s Mot. Summ. J. Resp. ("Pl.'s MSJ Resp.") [80] at 10–12 ("As a 70% indirect ownership stake in AAR through AAR Parent was BRI's only asset, a review of AAR Parent's Consolidated Balance Sheet assists in determining whether BRI itself was insolvent in January 2015."); Defs.' MSJ Reply at 5 ("BRI's solvency on January 12, 2015 is directly tied to the operations of AAR.").) This makes sense because BRI Holding's sole asset was its 70 percent ownership interest in AAR. Thus, if AAR was insolvent in January 2015 when BRI Holding transferred the tax distributions from AAR to Reschke and Bobb, that is persuasive evidence that BRI Holding was also insolvent at that time because its sole asset would have been worthless. On the other hand, and as Plaintiff notes, the fact of AAR's solvency at the time of the transfer is not equivalent to a market valuation of AAR and therefore of BRI Holding. Defendants again in their reconsideration briefs treat the financial status of AAR as key to the issue of BRI Holding's solvency. (Recons. Mem. at 3 ("As this Court found in its March 11, 2020 Memorandum Order and Opinion, the solvency of AAR Parent is a pivotal issue in this case.").) Defendants also assert that "[i]f goodwill is included as an asset, . . . Janssen concedes that AAR Parent was solvent at the time of the tax distribution on January 12, 2015." (*Id.*) Plaintiff does not dispute this assertion or Defendants' framing of the issue, instead explaining that Defendants' evidence does not amount to an expert assessment of BRI Holding's financial condition. Plaintiff also argues that the decline in oil prices in late 2014 and early 2015 raises factual issues regarding whether AAR should be valued on a liquidation basis or as a going concern, *see* U.S. Energy Info. Admin., *Cushing, OK WTI Spot Price FOB,*

16

https://www.eia.gov/dnav/pet/hist/RWTCD.htm (last visited October 11, 2020), and focuses on the reasonableness of any expectation that AAR would make additional distributions to BRI Holding after January 2015. (Pl.'s Recons. Resp. at 8–11.)

### 1. Was AAR "On its Deathbed" in January 2015?

Plaintiff does not challenge the accuracy of the Audit Report or the financial statements. (*Id.* at 8.) Plaintiff does argue that summary judgment in favor of Defendants remains inappropriate because the Audit Report and Representation Letter do not establish whether AAR was appropriately valued on a going concern or liquidation basis. (*Id.*; Pl.'s MSJ Resp. at 12.) The appropriate methodology for valuing AAR was a primary issue in this court's ruling on summary judgment, because it affects whether goodwill is properly counted as an asset. A business is ordinarily valued as a going concern unless it is on its deathbed. *Newman v. Assoc. Bank, Nat'l Ass'n* (*In re World Mktg. Chicago, LLC*), 574 B.R. 670, 679 (Bankr. N.D. Ill. 2017); *see also Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1067 (3d Cir. 1992) ("Where bankruptcy is not 'clearly imminent' on the date of the challenged conveyance, the weight of authority holds that assets should be valued on a going concern basis."). When a business is valued as a going concern, assets that depend on a business's continued operations for their value, such as goodwill, may be included in the valuation. *See Baldi v. Samuel Son & Co., Ltd.* (*In re McCook Metals, LLC*), No. 05 C 2990, 2007 WL 4287507, at *6 (N.D. Ill. Dec. 4, 2007); *see also, e.g., EBC I, Inc. v. Am. Online, Inc.* (*In re EBC I, Inc.*), 380 B.R. 348, 357 (Bankr. D. Del. 2008), *aff'd*, 382 F. App'x 135 (3d Cir. 2010); *Bergquist v. Anderson-Greenwood Aviation Corp.* (*In re Bellanca Aircraft Corp.*), 56 B.R. 339, 386 (Bankr. D. Minn. 1985).

Despite bearing the burden of proof on insolvency, Plaintiff has offered no evidence that AAR was on its deathbed such that goodwill should not be included in its valuation, and the evidence that Defendant provides persuasively suggests otherwise. *See Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 325 (1986)) ("[T]he movant's initial burden 'may be discharged by "showing" . . . that there is an

absence of evidence to support the nonmoving party's case.'  Upon such a showing, the nonmovant must then 'make a showing sufficient to establish the existence of an element essential to that party's case.'").  First, aspects of the Representation Letter and the Audit Report confirm that AAR's assets were valued by management and McGladrey on a going concern basis during the time surrounding the subject transfer, and that this was the correct valuation approach. The Representation Letter asserts that the financial statements were prepared and presented in accordance with U.S. GAAP, and further confirms that these financial statements contain the disclosures required by U.S. GAAP.  (Representation Letter ¶¶ 1, 5–8, 23.)  While neither party comments on this, the court notes that U.S. GAAP requires an entity to disclose, in notes to the financial statements, any conditions or events that would raise substantial doubts about the entity's ability to continue as a going concern.  ASC 205-40-50-12–13.  And an entity must disclose whether it has prepared financial statements using a liquidation basis of accounting. ASC 205-30-50-2.  Plaintiff identifies no such disclosures in AAR Parent's financial statements or the Representation Letter.  The Audit Report notes the potential risk posed by the fact that much of AAR's revenue depended on a single customer, but does not include any disclosures regarding AAR's ability to continue as a going concern. (*See* Audit Report at 8); *cf. Paloian v. LaSalle Bank Nat'l Ass'n* (*In re Doctors Hosp. of Hyde Park, Inc.*), 507 B.R. 558, 662 (Bankr. N.D. Ill. 2013) ("[T]he Hospital's auditors included a note in the September 30, 1999 financial statements questioning the Hospital's ability to continue operations.").  To be clear, U.S. GAAP is not binding on this court, but the absence of the disclosures that U.S. GAAP would require, were management or AAR's independent auditors seriously concerned about its ongoing viability, supports the inference that AAR Parent was properly valued as a going concern in December 2014.

Second, Plaintiff's primary evidence that AAR was in a precarious financial condition as of early 2015 is the decline in oil prices, and corresponding decline in demand for AAR's services, during 2014 and 2015.  The Representation Letter, however, undermines any inference of insolvency that could be drawn from the decline in the price of oil.  In the Letter, management

notes that they tested goodwill for impairment as of December 31, 2014. (Representation Letter ¶ 20; *see also* Audit Report at 10.) Notably, management tested goodwill based on the assumption that revenue would decline by 16.75 percent in 2015 before increasing by 10 percent in 2016–19. (Audit Report at 10.) The finding of no goodwill impairment means management determined that the estimated fair value of the company, assuming a revenue decline of 16.75 percent in 2015, was at least equal to the value reflected in its financial statements. (*See id.*; Representation Letter ¶ 20.) And again, management affirmed in the Representation Letter that the "[s]ignificant assumptions [they used] in making accounting estimates, including those measured at fair value, [were] reasonable," and that they otherwise agreed with any valuations by specialists that may have factored into this calculation. (Representation Letter ¶¶ 4, 23.) Had there been a decline in the fair market value of AAR compared to its book value as a result of the declining price of oil, that would have been noted as an impairment of goodwill, reducing the valuation of $81 million recorded in AAR's books. (Audit Report at 3, 10.)

Finally, the record as a whole supports a finding that AAR was not on its deathbed in January 2015. On the one hand, AAR's current liabilities were greater than its current assets both as of December 31, 2014 and January 2015, (Audit Report at 3), an indication that AAR could have trouble funding its operations, *see In re World Mktg.*, 574 B.R. at 683; *In re Joy Recovery Tech.*, 286 B.R. at 76, and most of AAR's assets were encumbered by the Medley Capital loan. But there is no indication in the record that AAR was not paying its creditors in late 2014 or early 2015. *Cf. Geltzer v. Bloom* (*In re M. Silverman Laces, Inc.*), 404 B.R. 345, 362 (Bankr. S.D.N.Y. 2009) (finding that a company was at "death's door" when it was unable to pay its rent, largest supplier, and other creditors, and it lacked unencumbered assets). AAR continued operating during the relevant time; revenue was projected to increase 10 percent per year from 2016 to 2019 (Representation Letter ¶ 20); and as of December 31, 2014, AAR had positive operating income, positive cash flow, and positive member equity. (Audit Report at 4–7.) The unaudited financial statement from January 2015 shows that AAR still had positive cash flow and member

equity at the end of that month.  (Jan. 2015 Balance Sheet, Ex. 4 to Manning Decl.)  And, as discussed above, the Representation Letter reports that goodwill was not impaired as of December 31, 2014 despite the projected revenue decline.  Plaintiff points to no other financial documents supporting a contrary inference about AAR's ability to continue operating.  Given that AAR's financial statements, management's valuation of goodwill, and McGladrey's Audit Report accounted for the anticipated revenue decline, Plaintiff's evidence that the price of oil was declining in late 2014 and into early 2015 does not satisfy the court that AAR was on its deathbed at the time of the disputed transfers.  *See Baldi v. Samuel Son & Co., Ltd.*, 548 F.3d 579, 583 (7th Cir. 2008) ("[A]ll businesses are at risk of future changes in supply or demand that cannot be predicted with any certainty; that does not make them insolvent.").

### 2.   Was AAR Solvent?

Insolvency is a question of fact, *Bachrach Clothing, Inc. v. Bachrach* (*In re Bachrach Clothing, Inc.*), 480 B.R. 820, 859 (Bankr. N.D. Ill. 2012), and is defined by both the Bankruptcy Code and the Illinois Uniform Fraudulent Conveyance Act ("UFTA") "as having a balance sheet on which liabilities exceed [the fair market price of] assets." *Baldi*, 548 F.3d at 581; *In re World Mktg.*, 574 B.R. at 679.  Courts emphasize that the "[m]arket value of both assets and liabilities," not book value (cost less depreciation), determines solvency under the bankruptcy code and the UFTA.  *Covey v. Commercial Nat. Bank of Peoria*, 960 F.2d 657, 660 (7th Cir. 1992).  That is, "[a]ccountants may value assets at cost ('book value'), but if the market value of a firm's assets exceeds its liabilities, it is solvent notwithstanding red ink in the balance sheet." *Id.*  "The reverse is true as well:  a firm whose assets are worth less than the book value may be insolvent despite a financial statement showing positive net worth." *Id.*; *see also Lawson v. Ford Motor Co.* (*In re Roblin Indus. Inc.*), 78 F.3d 30, 36 (2d Cir. 1996) (quotation and alterations omitted) ("The market value of particular property may of course differ substantially from its book value.").  Accordingly, "[w]hether a debtor is insolvent under the balance sheet test is determined by analyzing what a

willing buyer would have given for the debtor's entire package of assets and liabilities at the relevant time." *In re Doctors Hosp.*, 507 B.R. at 632.

Appropriate proof of insolvency includes "balance sheets, financial statements, appraisals, expert reports, and other affirmative evidence." *In re World Mktg.*, 574 B.R. at 679. Ideally, "the valuation of assets and liabilities for the purpose of performing this analysis should be determined by expert testimony or recent appraisals." *Id.* But "[w]hile book values alone may be inappropriate as a direct measure of the fair value of property, . . . such figures are, in some circumstances, competent evidence from which inferences about a debtor's insolvency may be drawn." *Official Comm. of Unsecured Creditors of SGK Ventures, LLC v. NewKey Grp., LLC* (*In re SGK Ventures, LLC*), 521 B.R. 842, 859 (Bankr. N.D. Ill. 2014) (quoting *In re Roblin Indus.*, 78 F.3d at 36) (affirming a finding of insolvency based on financial statements and a narrative description of the company's financial health and adverse market conditions in a SEC Registration Statement).

As noted in this court's summary judgment ruling, neither party has offered expert testimony on the appropriate value of BRI Holding in January 2015 nor appraisals of the entity from that month. Accordingly, the market value of BRI Holding's 70 percent interest in AAR Parent, and whether that exceeds the $5 million liability on Janssen's Note, cannot be determined from this record with certainty. The decisive factor for purposes of this motion and Defendants' motion for summary judgment, however, is that Plaintiff bears the burden of proof on this issue, and the Representation Letter, together with Defendants' other evidence, shows that Plaintiff has failed to raise a genuine issue for trial related to whether BRI Holding was solvent. The Representation Letter supports an inference that AAR was solvent by confirming the accuracy of the Audit Report and providing context to aid in its interpretation. The Audit Report includes a consolidated balance sheet for AAR Parent and its subsidiaries showing that, as of December 31, 2014, AAR's assets exceeded its liabilities. (*See* Audit Report at 3.) The Audit Report discloses that the tax distribution from AAR to BRI Holding and AAR's other members was accounted for in the consolidated balance sheet as an accrued liability of $2,718,159. (*Id.* at 20.) That is, the

balance sheet shows that assets exceed liabilities, even accounting for the tax distribution as a liability. While the consolidated balance sheet may show book values of some of AAR Parent's assets rather than fair market values, *see Covey*, 960 F.2d at 660, it is nonetheless persuasive evidence that AAR Parent was balance-sheet solvent as of December 31, 2014 and that the tax distribution did not affect that assessment. *See In re SGK Ventures*, 521 B.R. at 859.

Defendants offer additional evidence bolstering an inference of solvency, as well. First, BRI Holding paid about $100 million to acquire a 70 percent interest in AAR on September 30, 2014, three and a half months prior to the subject transfers.[11] (Defs.' SOF Resp. ¶¶ 9, 11); *see also Moody*, 971 F.2d at 1067 ("[P]urchase price may be highly probative of a company's value immediately after a leveraged buyout."). Second, AAR Parent reported $9,973,943 in taxable income based on $39,749,342 in revenue for the fourth quarter of 2014 even as oil prices declined. (Ex. 7 to Reschke Decl. [75-1].) Declining oil prices did apparently have an effect on AAR's business in the first quarter of 2015. By March 31, 2015, AAR's quarterly revenue had declined to $23,268,740 and its EBITDA was $5,303,746. (Pl.'s SOF Resp. ¶ 21; Ex. 8 to Reschke Decl. [75-1].) But AAR's January 31, 2015 financial statements show total assets of $139,240,757 compared to liabilities of $120,039,454—balance sheet solvency—as well as $19,201,303 in shareholder equity and $4,785,607 of cash. (*See* Jan. 2015 Balance Sheet.) That is, AAR's unaudited financial statements from the first quarter of 2015 show that the decline in AAR's business accelerated during early 2015, but that its financial condition was relatively stable through the time of the subject transfer in mid-January. Plaintiff points to no financial statements suggesting otherwise.

---

[11] Plaintiff does not dispute the valuation, but notes that the nearly $100 million loan from Medley Capital to finance the purchase was actually issued to AAR Parent. (Pl.'s MSJ Resp. at 10 n.5.) Although neither party identifies the transaction as such, it resembles a leveraged buyout ("LBO"). *See Boyer v. Crown Stock Distrib., Inc.*, 587 F.3d 787, 791–92 (7th Cir. 2009) ("In a conventional LBO, an investor buys the stock of a corporation from the stockholders with the proceeds of a loan secured by the corporation's own assets.").

Plaintiff offered no financial statements or other evidence that calls into question the inference that AAR was solvent at the time of the subject transfers. Instead, the evidence provided by Plaintiff either relates to circumstances after the subject transfers or to the decline in oil prices which was factored into the auditor's opinion, management's impairment test of goodwill, and revenue projections. In opposition to Defendants' motion for summary judgment, Plaintiff suggested that BRI Holding was insolvent because after the distribution from AAR in January 2015, BRI Holding never received another distribution, and in April 2016, BRIP transferred its interest in AAR Parent to Medley Capital. (Pl.'s SOF Resp. ¶ 27.) Moreover, the price of oil fell rapidly and substantially in late 2014 and early 2015. (Pl.'s MSJ Resp. at 10.) The court has already discussed why the decline in oil prices does not raise a question about AAR as a going concern. That AAR was worthless by December 21, 2016 (Defs.' SOF Resp. ¶ 23)—thereby rendering BRI Holding's sole asset worthless—likewise does not persuasively counter Defendants' evidence that BRI Holding was solvent in January 2015.

The Seventh Circuit has cautioned that "[h]indsight bias is to be fought rather than embraced" when determining solvency. *Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688, 693 (7th Cir. 2010); *see also Boyer*, 587 F.3d at 795 ("Whether a transfer was fraudulent when made depends on conditions that existed when it was made, not on what happened later to affect the timing of the company's collapse."). It is true that courts sometimes apply the "rule of retrojection," which permits a trustee in bankruptcy to meet his burden of proving insolvency by demonstrating that "the debtor was insolvent at one point in time and then prov[ing] that the same condition existed at the time of the subject matter transfer." *In re McCook Metals*, 2007 WL 4287507, at *4 (citing *Barber v. Prod. Credit Servs. of W. Cent. Ill.* (*In re KZK Livestock, Inc.*), 290 B.R. 622, 625 (Bankr. C.D. Ill. 2002)). But applying the rule of retrojection here does not help Plaintiff, because it does not establish that BRI Holding was insolvent in January 2015. BRI Holding obtained a 70 percent interest in AAR for nearly $100 million in September 2014. AAR's financial statements showed that assets exceeded liabilities as of December 31, 2014, and later in January 31, 2015

23

after the subject transfer.  The absence of any impairment of goodwill suggests that there was no substantial change in AAR's financial condition between September and December 31, 2014, and goodwill reflected only depreciation in the January 31, 2015 financial statements.  Additionally, a Business Plan prepared for AAR as of February 6, 2015 predicted that AAR would continue to be profitable despite a projected revenue decline of 21.3 percent in 2015, and projections indicated that AAR would have sufficient EBITDA to cover its fixed obligations.  (*See* Business Plan at 13, Ex. 9 to Reschke Decl. [75-1].)[12]  In short, the record shows that AAR's financial condition was different in January 2015 than it was later in the spring of 2015 when it stopped paying distributions, or in 2016 when BRIP transferred its interest in AAR to Medley Capital before AAR became worthless.

Plaintiff also contends that the decline in oil prices creates a question of material fact regarding whether Defendants could reasonably have expected another distribution after January 2015.  (Pl.'s Recons. Resp. at 8–9.)  This argument does not alter the above solvency analysis. An entity with limited liquidity may have inadequate assets to meet its prospective obligations, but not be insolvent in the balance-sheet sense.  To the extent Plaintiff uses BRI Holding's limited cash to raise a presumption of insolvency, the court's earlier opinion noted that Plaintiff has offered no evidence that BRI Holding was not paying its debts as they became due in January 2015.  Plaintiff suggested that Defendants did not pay the full interest due on the Note in January 2015, but could provide nothing but hearsay in support of the allegation that the $125,000 paid did not equal the amount owed.  *See Janssen v. Reschke*, No. 17 C 8625, 2020 WL 1166221, at *6 n.4 (N.D. Ill. Mar. 11, 2020); *see also Neuhauser*, 528 F. Supp. 2d at 851 ("Mere speculation or conjecture will not defeat a summary judgment motion.").

As Plaintiff notes, the Representation Letter in combination with the Audit Report and other evidence of solvency provided by Defendants in support of their motion for summary judgment

---

[12]     Plaintiff previously challenged the admissibility of the 2015 Business Plan, but the court overruled the objection.  *Janssen*, 2020 WL 1166221, at *9 n.8.

does not show definitively that BRI Holding's assets exceeded its liabilities on January 12, 2015. That is, financial statements are not a concrete valuation of BRI Holding's 70 percent interest in AAR in the same way as an expert report or contemporaneous appraisal. But Defendants came forward with evidence supporting an inference that AAR, and by extension BRI Holding, was solvent at the relevant time. Plaintiff bears the burden of proving by a preponderance of the evidence that BRI Holding was insolvent, but has pointed to no evidence to counter this inference of solvency in January 2015. The court concludes Plaintiff has not met his burden of showing that BRI Holding was insolvent when it made the tax distribution to Reschke and Bobb, or that it was rendered insolvent by the transfers. The court addresses the effect of this finding on Plaintiff's claims below.

### C.    The Effect of the Solvency Finding on Plaintiff's Claims

The Illinois Uniform Fraudulent Transfer Act ("UFTA") identifies two kinds of fraudulent transfers: "fraud in law" and "fraud in fact." *Bank of Am. v. WS Mgmt., Inc.*, 2015 IL App (1st) 132551, ¶ 87, 33 N.E.3d 696, 723 (1st Dist. 2015) (citing *Apollo Real Estate Inv. Fund, IV, L.P. v. Gelber*, 403 Ill. App. 3d 179, 193, 935 N.E.2d 963, 976 (1st Dist. 2010)). A "fraud in law" transfer is described in Sections 5(a)(2) and 6(a) of the UFTA, and occurs when the "transfer is made for no or inadequate consideration, and the fraud is presumed." *People ex rel. Dep't of Human Rights v. Oakridge Nursing & Rehab Ctr.*, 2019 IL App (1st) 170806, ¶ 41, 128 N.E.3d 397, 406 (1st Dist. 2019). A "fraud in fact" transfer is set forth in Section 5(a)(1) of the UFTA, and requires a party to prove that the "transfer was made with actual intent to hinder, delay, or defraud the creditors." *Bank of Am.*, 2015 IL App (1st) 132551, ¶ 87, 33 N.E.3d at 723.

### 1.    Fraudulent Transfer Pursuant to 740 ILCS 160/6(a) (Count I)

Section 6(a) of the Illinois UFTA identifies one type of fraud-in-law transfer and states that "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred" if two conditions are met. 740 ILCS 160/6(a). The creditor must show, first, that the debtor "made the transfer or incurred the

obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation," and second, that "the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." *Id.* The court has already concluded that BRI Holding did not, as a matter of law, receive reasonably equivalent value for the tax distributions. BRI Holding was taxed by default as a partnership. Its commitment to reimburse its members for their income tax liability was, thus, equivalent to a corporate dividend for which BRI Holding received no consideration. *See In re SGK Ventures*, 521 B.R. at 859. Defendants have not asked the court to reconsider that holding, and nothing in their new evidence prompts the court to do so. As discussed above, in light of the new evidence, Plaintiff has failed to establish a factual dispute about whether AAR was properly valued as a going concern, and therefore whether goodwill should be included in AAR's valuation. And Plaintiff has failed to point to a genuine issue of material fact regarding whether BRI Holding was balance-sheet insolvent at the time of the transfer, nor whether BRI Holding became insolvent as a result of the subject transfer. Defendants' motion to reconsider is granted in part; the court now grants their motion for summary judgment on Count I of Plaintiff's amended complaint.

### 2. Fraudulent Transfer Pursuant to 740 ILCS 160/5(a)(2) (Count II)

The second type of fraud-in-law transfer is described in Section 5(a)(2) of the Illinois UFTA. As in Section 6(a) of the UFTA, a plaintiff must show that the debtor made the transfer "without receiving a reasonably equivalent value in exchange for the transfer," but a Section 5(a)(2) showing does not require that the creditor's claim arose prior to when the transfer was made. 740 ILCS 160/5(a)(2). Rather, under Section 5(a)(2), a creditor may have a claim for a fraudulent transfer regardless of whether its "claim arose before or after the transfer was made," so long as one of two conditions is met. *Id.* The debtor must have either "engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction," or the debtor must have "intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they

became due." 740 ILCS 160/5(a)(2). As explained above, the court declines to alter its finding that BRI Holding did not receive reasonably equivalent value in exchange for the transfer of the tax distribution to Defendants.

"The test under 740 ILCS 160/5(a)(2) for whether a company had adequate capital after a contested transfer to fund its operations is not the same as that for insolvency."[13] *In re Joy Recovery Tech.*, 286 B.R at 76; *see also Vadnais Lumber Supply, Inc. v. Byrne* (*In re Vadnais Lumber Supply, Inc.*), 100 B.R. 127, 137 (Bankr. D. Mass. 1989) ("Unreasonably small capitalization [ ] encompasses difficulties which are short of insolvency in any sense but are likely to lead to insolvency at some time in the future."). Rather, having inadequate capital means that the subject transaction put the company "on the road to ruin," which requires more than a showing of a deteriorated balance sheet after the transfer. *In re Joy Recovery Tech.*, 286 B.R. at 76; *see also Burtch v. Opus LLC* (*In re Opus E. LLC*), 698 F. App'x 711, 715 (3d Cir. 2017) (citing *Moody*, 971 F.2d at 1070) ("An entity has unreasonably small capital if it lacks the ability to generate sufficient profits to sustain operations."). Relevant considerations include a company's working capital,[14] cash flow, the availability of credit, and whether the company survived for an extended period after the disputed transaction. *In re Joy Recovery Tech.*, 286 B.R. at 76; *see also Boyer*, 587 F.3d at 795. The analysis is "forward looking" and "requires assessing the debtor's reasonable prediction about its ability to repay a debt as it is incurred." *In re Opus*, 698 F. App'x at 715; *see also In re Doctors Hosp.*, 507 B.R. at 635. A court may, however, consider whether the debtor "was able to pay, intended to pay, [or] . . . was paying its debts as they came due." *In re Opus*, 698 F. App'x at 715.

---

[13] The UFTA refers to "unreasonably small assets" rather than "capital" as in the Uniform Fraudulent Conveyance Act to avoid confusion with corporate law concepts of capital. *In re Vadnais*, 100 B.R. at 137. The following discussion is based on case law applying the UFTA or UFCA despite the use of "capital" rather than "assets."

[14] "Working capital is the difference between a company's current assets and its current liabilities." *In re Joy Recovery Tech.*, 286 B.R. at 76.

Defendants did not directly address the Representation Letter's effect on the adequacy of BRI Holding's assets in comparison to its obligation on the Note or on the reasonableness of BRI Holding's belief that it would be able to pay its debts as they became due. Instead, Defendants argued only that solvency is dispositive of Count II. (Defs.' Recons. Reply at 5.) But balance sheet solvency is not dispositive here. *See In re Joy Recovery Tech.*, 286 B.R at 76. Moreover, even in light of the inferences that can be drawn from the Representation Letter and the McGladrey Audit Report, from the evidence in the record, a reasonable jury could conclude that BRI Holding did not have adequate assets to meet its obligations or that it could not reasonably believe that it would be able to pay the interest installments on the Note as they became due after the transfer. For example, while BRI Holding's sole asset, AAR, had total assets that exceeded total liabilities, according to the Audit Report and AAR's January 2015 financial statements, AAR had negative working capital both in December 2014 and January 2015. (Audit Report at 3; Jan. 2015 Balance Sheet.) Despite projections that AAR would be able to meet its fixed obligations (Business Plan at 13), BRI Holding had no guaranteed cash flow to meet its own fixed obligations, especially in light of the decline in oil prices. *Cf. Moody*, 971 F.2d at 1075 (affirming that the challenged transaction did not leave the company with an unreasonably small capital because the "drastic decline in sales was unforeseeable" as of the date of the transaction). Additionally, the transfer to Reschke and Bobb was of all BRI's remaining cash after the January 2015 interest payment on the Note, and it would have been difficult for BRI Holding to borrow against its 70 percent interest in AAR that was encumbered by the Medley loan. *See Boyer*, 587 F.3d at 795. Finally, while AAR continued operating into 2016, BRI Holding never made another interest payment on the Note after January 2015. Defendants' motion to reconsider denial of summary judgment on Count II is denied.

### 3. Fraudulent Transfer Pursuant to 740 ILCS 160/5(a)(1) (Count III)

To succeed on a claim of actual fraud, or fraud in fact, against Defendants, Plaintiff must show that BRI Holding made the tax distribution to Defendants "with actual intent to hinder, delay,

or defraud" its creditors. 740 ILCS 160/5(a)(1). Fraudulent intent in making a transfer may be inferred from the existence of certain factors, called "badges of fraud," that are laid out in Section 5(b) of the Illinois UFTA. *See Bank of Am.*, 2015 IL App (1st) 132551, ¶ 88, 33 N.E.3d at 724; 740 ILCS 160/5(b)(1)-(11). A court need not consider all of the factors, but when 'the factors are present in sufficient number, 'it may give rise to an inference or presumption of fraud.'" *See Bank of Am.*, 2015 IL App (1st) 132551, ¶ 89, 33 N.E.3d at 724. Once the creditor has raised an inference of fraud, the debtor and donee have the "burden of going forward with evidence to rebut or meet the presumption." *McHugh v. Anderson* (*In re McHugh*), No. 02 A 00254, 2003 WL 21018601, at *6 (Bankr. N.D. Ill. May 1, 2003). Courts applying Illinois law note that the "presence of only one factor could entitle a party to relief." *Bank of Am.*, 2015 IL App (1st) 132551, ¶ 89, 33 N.E.3d at 724. Summary judgment should be "used sparingly and with great caution in cases . . . where subjective intent is a factor in the determination." *Grede v. UBS Sec., LLC*, 303 F. Supp. 3d 638, 656 (N.D. Ill. 2018), *recons. denied sub nom. Grede as Tr. of Estate of Sentinel Mgmt. Grp., Inc. v. UBS Sec., LLC*, No. 09 C 5880, 2019 WL 1399947 (N.D. Ill. Mar. 28, 2019) (quoting *Alexander v. Erie Ins. Exch.*, 982 F.2d 1153, 1160 (7th Cir. 1993)).

In its ruling on Defendants' motion for summary judgment, the court found that the presence of several "badges of fraud" supported a presumption of fraud and that Defendants failed to rebut that presumption. Whether the debtor is insolvent is only one consideration, and the new evidence provided by Defendants does not undermine the court's findings related to the other badges of fraud. Specifically, the court explained that a reasonable jury could find that (1) BRI Holding transferred the tax distributions to insiders, (2) the value of the consideration received by BRI Holding was not reasonably equivalent to the value of the assets transferred to Defendants, and (3) the transfer occurred shortly after a substantial debt was paid and before another substantial debt was due. *Janssen*, 2020 WL 1166221, at *10–11. Considering this evidence, a reasonable trier of fact could still conclude that the transfer to Defendants was fraudulent rather than a normal distribution of previously earned profits; tax distributions were not

mandatory under the circumstances, and the transfer represented all of BRI Holding's remaining cash, leaving no margin for the anticipated cash needs of the business. Accordingly, the court denies Defendants' motion to reconsider the court's denial of summary judgment on Count III of Plaintiff's amended complaint.

### 4. Piercing the Corporate Veil (Count IV)

Illinois courts are reluctant to pierce the corporate veil, *Benzakry v. Patel*, 2017 IL App (3d) 160162, ¶ 65, 77 N.E.3d 1116, 1131 (3d Dist. 2017), but will do so when two separate prongs are met. First, "there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist," and second, "circumstances must be such that adherence to the fiction of separate corporate existence would sanction fraud or promote injustice." *Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 751 (7th Cir. 2012) (quoting *Hystro Prods., Inc. v. MNP Corp.*, 18 F.3d 1384, 1388–89 (7th Cir. 1994)). There are several factors relevant to a determination of whether there is a unity of interest and ownership in a corporation (or an LLC), only one of which is corporate insolvency. In opposition to Defendants' motion for summary judgment, Plaintiff argued that there was a unity of interest and ownership such that BRI Holding did not have an existence separate from Defendants due to the inadequate capitalization of BRI Holding, BRI Holding's insolvency, and the diversion of assets to BRI Holding's owners to the detriment of its creditors. The court found that there were factual issues precluding summary judgment as to each factor. Nothing in Defendants' new evidence disturbs the court's finding that the transfer was to insiders and that there is a factual dispute regarding the undercapitalization of BRI. *See Baldi*, 548 F.3d at 583 (citing *Moody*, 971 F.2d at 1069–71) ("Undercapitalization is not a synonym for insolvency. . . . [It] should rather be termed excessive leverage, [and] while it increases the risk of insolvency, is not insolvency."); *see also Boyer*, 587 F.3d at 794–95. Accordingly, Defendants' new evidence is not dispositive of the unity of interest and ownership prong of Plaintiff's veil-piercing claim.

The court's finding that there is a factual issue precluding summary judgment on the "sanctioning fraud" or "promoting injustice" prong of the inquiry is likewise not affected by the evidence supporting BRI Holding's solvency. That determination rested on Plaintiff's argument that Defendants "squirrel[ed] assets" to themselves while "heaping liabilities upon an asset-free corporation," through the alleged fraudulent transfers. *See also Laborers' Pension Fund v. Lay-Com, Inc.*, 580 F.3d 602, 611 (7th Cir. 2009) (quoting *Hystro Prods.*, 18 F.3d at 1391) (explaining that "if a corporation is organized and carries on business without substantial capital in such a way that the corporation is likely to have no sufficient assets available to meet its debts," that is "sufficient" to find that respecting the corporate form would sanction fraud or promote injustice, because "it is inequitable that shareholders set up such a flimsy organization to escape personal liability."). Because there remain genuine factual disputes regarding the alleged fraudulent transfers, summary judgment on prong two of Plaintiff's veil-piercing claim is also inappropriate. Defendants' motion to reconsider based on new evidence is denied with regard to Count IV.

## II.    Reconsideration of Plaintiff's Veil-Piercing Claim / Reliance

In addition to their argument based on new evidence, Defendants seek reconsideration of the court's ruling on Plaintiff's veil-piercing claim on another basis: absence of a showing of reliance. In its prior ruling, the court found that there were issues of fact precluding summary judgment on the second prong of veil-piercing inquiry. The court recognized that "[t]here is no fraud or injustice, hence no basis for piercing a corporate veil, without reliance by the would-be piercer." *On Command Video Corp. v. Roti*, 705 F.3d 267, 273 (7th Cir. 2013); *see also Fusion Capital Fund II v. Ham*, 614 F.3d 698 (7th Cir. 2010). The parties agree that they did not directly brief this issue. (Recons. Mem. at 6; Pl.'s Recons. Resp. at 11–12.) The court was prompted to discuss the issue by Defendants' statement that "people who knowingly deal with a corporate entity without getting a guaranty cannot turn to its investors on an alter-ego or veil piercing theory." (Defs.' MSJ Reply at 12 (citing *Fusion Capital Fund*, 614 F.3d at 702).) Defendants supported their argument by explaining that, at the time Plaintiff loaned money to BRI Holding, Plaintiff

31

understood that BRI Holding was a newly formed holding company, was represented by counsel in the transaction, and nonetheless did not request that Defendants personally guaranty the Note. (Defs.' MSJ Reply at 11.)

Defendants' citation to *Fusion Capital Fund* in their summary judgment briefs is most clearly understood as an argument that there is no fraud or injustice warranting piercing the corporate veil when the would-be piercer knowingly dealt with an insolvent corporation. *See Fusion Capital Fund*, 614 F.3d at 702 ("We do not know of any statute or decision, in any American jurisdiction, holding that investors in a thinly capitalized corporation are personally liable for its debts to a contracting partner when that partner, with knowledge of the corporation's insolvency, signs without getting a guaranty from the investors."); *Hanson v. Bradley*, 298 Mass. 371, 381, 10 N.E.2d 259, 264 (1937) ("The fair inference is that [Plaintiff] knew the worthlessness of the corporation with which he contracted, and knew that his contract was of no value unless the corporation could borrow money."). In such circumstances, the would-be piercer is not justified in relying on a separate corporate existence. Because the parties did not directly address the issue, the court agrees that it misunderstood the nature of the argument that Defendants made during summary judgment briefing. Additionally, the issue of Plaintiff's reliance was developed (insofar as it was raised at all) only in Defendants' summary judgment reply brief. *See Wonsey v. City of Chicago*, 940 F.3d 394, 398 (7th Cir. 2019) ("[A]rguments raised for the first time in a reply brief are waived.").

The court nevertheless declines to reconsider the denial of Defendants' motion for summary judgment on Plaintiff's veil-piercing claim. Whether Plaintiff knew from the outset that BRI Holding was insolvent, *see Fusion Capital Fund*, 614 F.3d at 703, or rather was led to think that BRI was "normally capitalized and [would] be able to satisfy its obligations," *id.* at 701, is a matter that could have been raised in Defendants' summary judgment brief. Defendants provide no explanation for their failure to raise this argument sooner, and cite no authority post-dating this court's opinion that could have altered its treatment of the issue. Instead, Defendants supplement

their non-reliance argument with an assertion that piercing the corporate veil is not appropriate when the would-be piercer benefits from a transaction with the corporation. (Defs.' Recons. Reply at 8–9 (citing *Main Bank of Chi. v. Baker*, 86 Ill. 2d 188, 427 N.E.2d 94 (1981); *Tower Investors, LLC v. 111 E. Chestnut Consultants, Inc.*, 371 Ill. App. 3d 1019, 864 N.E.2d 927 (1st Dist. 2007)). A party asking the court to reconsider its earlier decision may not "relitigate previously rejected arguments or argue 'matters that could have been heard during the pendency of the previous motion.'" *Goulding*, 2020 WL 1445619, at *2 (quoting *Caisse Nationale*, 90 F.3d at 1270); *see also Bally Export Corp. v. Balicar, Ltd.*, 804 F.2d 398, 404 (7th Cir. 1986) ("[A] motion for reconsideration is an improper vehicle to . . . tender new legal theories."). Defendants are entitled to disagree with this court's analysis of *On Command Video* and *Fusion Capital Fund*, but Defendants' discussion in their motion for reconsideration does not persuade the court that it misunderstood either of those cases.

Defendants have not established that reconsideration is warranted. Because, however, both parties agree that they did not brief the issue of reliance, the court will delete from its prior opinion the discussion of whether Plaintiff could reasonably have relied on BRI Holding's being a normally capitalized LLC capable of meeting its obligations. Summary judgment for Defendants on Plaintiff's veil-piercing claim nevertheless remains inappropriate. As discussed above, there remain disputed factual issues regarding both prongs of the inquiry—first, whether there was a unity of interest and ownership between BRI Holding and Defendants based on undercapitalization and a transfer to insiders; and second, whether Defendants abused the corporate form by establishing a thinly-capitalized LLC and then stripping it of liquid assets (via the alleged fraud-in-fact transfer) in a way that frustrated BRI Holding's ability to satisfy its debts. Based on the parties' reconsideration briefs, an additional issue for trial may be whether Plaintiff knew he would be dealing with an LLC that was a "husk without any corn inside." *Fusion Capital Fund*, 614 F.3d at 701. Defendants' motion for reconsideration of this claim is denied.

## CONCLUSION

The Representation Letter signed by Plaintiff Janssen and received by Defendants Reschke and Bobb after this court's ruling on Defendants' motion for summary judgment clarifies the summary judgment record as it relates to the issue of BRI Holding's solvency at the time of the alleged fraudulent transfer to Defendants. In light of the Representation Letter, the court concludes that there is no genuine a genuine issue for trial. This determination affects Count I of Plaintiff Janssen's amended complaint, and the court enters summary judgment in favor of Defendants on that Count only. Defendants have not explained why they did not, in their motion for summary judgment address the issues of the reasonableness of Plaintiff's reliance on BRI Holding being a normally capitalized LLC, or whether one who benefits from a transaction may pierce a corporate veil. Accordingly, the court declines to disturb its finding that there is a genuine issue of material fact precluding summary judgment on Plaintiff's veil-piercing claim (Count IV), but will modify its summary judgment opinion [87] to delete discussion of reliance in the context of piercing the corporate veil. The court grants in part and denies in part Defendant Reschke and Defendant Bobb/AAR Investments, LLC's motion for reconsideration [92].

ENTER:

Dated: October 13, 2020

_____
REBECCA R. PALLMEYER
United States District Judge

34